**INTERSTATE UNITED CORPORATION,**
**an Illinois Corporation, Appellant,**

v.

**Thomas C. WHITE, Appellee.**

**No. 9241.**

United States Court of Appeals
Tenth Circuit.

Nov. 22, 1967.

Rehearing Denied En Banc
Feb. 12, 1968.

Bernard J. Nussbaum, Chicago, Ill., (John W. Swinford, Oklahoma City, Okl., and Alan H. Silberman, Chicago, Ill., with him on brief) for appellant.

Calvin W. Hendrickson, Oklahoma City, Okl., for appellee.

Before MURRAH, Chief Judge, BROWN * and HICKEY, Circuit Judges.

HICKEY, Circuit Judge.

Appellee buyer, a resident of Oklahoma, sued appellant seller, an Illinois corporation, for breach of a contract to sell an operating vending machine business. Diversity of citizenship and the amount of damage claimed establish jurisdiction.

The seller, Interstate United, contends there was no contract, or if one existed, it was voided through the application of the Statute of Limitations of both Illinois and Oklahoma. Interstate United further contends that the court erred by taking the issues of the existence of the contract and the application of the statutes of limitations away from the jury and by directing them that a contract existed. It is also argued by the seller that the instructions given and properly objected to on the issue of damages were erroneous or confusing.

The buyer, White, a former officer and employee of the seller, offered by letter to purchase the Oklahoma business of the seller. Attached to the letter offer was an inventory of machines which made up part of the assets of the going

* Of the Fifth Circuit, sitting by designation.

business at or about the time the offer was made.

An increased offer was negotiated in Chicago, Illinois, where the parties met with their respective attorneys to formalize a written agreement.

A preliminary draft of the formalized agreement was forwarded to White's attorney by Interstate United's attorney. White's attorney proposed a revision of the preliminary draft and returned it to the seller's attorney. The revisions were discussed at a meeting of the parties. After this meeting Interstate United announced that no further drafts would be prepared until White obtained a consent from the lessor of the premises which were being used as the business location of the seller in Oklahoma City. The seller further required that the consent contain a full release of his obligations to the lessor. White obtained the required consent and release. Thereafter, additional drafts were prepared and circulated formalizing the revised matters upon which agreement had been reached.

On March 25, 1965, Interstate United prepared and forwarded to White a writing which contained all the matters upon which agreement had been reached. The exhibit "A" attached thereto purported to be a list of the vending machines to be sold and delivered, subject, however, to the provision contained in the agreement authorizing an adjustment of price for machines not available at the time of delivery. This exhibit "A" is identified in the record as a February 5, 1965 IBM-run inventory.

The inventory forwarded with the original offer on November 28, 1964, listed 1,017 machines which were included in White's offer to purchase all the assets at their depreciated book value as of December 12, 1964. These assets were to be valued at $174,022.43. It is contended by the buyer that the increased price negotiated at the subsequent meetings was based upon this inventory.[1]

Interstate United contends that it continuously questioned whether or not the original inventory of 1,017 machines contained machines which had been taken from the Tinker Air Base Restaurant at or near Oklahoma City and shipped out of the trade area. White denied that any of the questioned machines were included. The record shows that the inventory contained 54 of these questioned machines, which by virtue of the provision authorizing an adjustment of price for machines not available at the time of delivery, would effect a reduction in price.

The exhibit "A" attached by Interstate United to the final draft submitted to White, identified as the February 5, 1965 IBM-run inventory, was questioned by White. White testified that upon receipt of the final draft he contacted Interstate United's officer with whom he had been negotiating and called attention to the attached exhibit "A". White further testified that in this conversation Interstate United's officer acknowledged that the attached exhibit "A" was a mistake. With this understanding White executed the agreement, substituted the inventory list which had been transmitted with the original offer, and forwarded the documents to his lawyer in Chicago. Thereafter, on April 2, 1965, letters were written by Interstate United to suppliers manifesting the intention to transfer the business as of that date. Other manifestations of transfer as of April 2, 1965, were also offered in evidence by the buyer and denied by the seller.

On April 9, 1965, the parties, with their lawyers and accountants, met at a designated bank in Oklahoma City to conclude the transaction. A disagreement arose as to what should be contained in exhibit "A" and the failure of the parties to agree terminated the entire transaction. White then sued Interstate United for breach of contract.

In its verdict instruction the court determined, "as a matter of law there is

---

1. The two exhibit "A"s are the only inventory lists which were prepared or attached to any offers or drafts during the entire negotiations.

ample evidence in this case to establish a valid and enforceable contract between the parties herein if there was in fact a meeting of the minds or agreement of both plaintiff [appellee] and defendant [appellant] that the Tom White Exhibit A should be attached to the contract." Joseph E. Seagram & Sons, Inc. v. Shaffer, 310 F.2d 668, 675 (10th Cir. 1962). Thus, the only issue upon which there was disagreement was submitted to the jury. On conflicting evidence the jury found the "Tom White Exhibit A" was the one on which there was agreement and the minds had met. This finding completed the contract for the sale of a going business and sealed the bargain of the parties thereto.

■■ The trial court correctly concluded from the evidence that a writing existed which indicated a contract for the sale of the business had been made. Likewise, manifestations that the seller who was being charged with the breach had authenticated the writing provided a proper basis for finding that the contract was outside the Illinois Statute of Frauds.[2]

The manifestations of authentication include the seller's preparing of the final draft, requiring a consent for assignment of the lease transferred under the contract releasing the seller from its obligations, and directing letters to suppliers advising them the Oklahoma business was being sold to White, "effective close of business, Friday, April 2, 1965." The record also indicates Interstate United attended the April 9 closing with all documents necessary to effectuate finality of the transaction. Such documents included "[c]ertified resolutions of the board of directors and stockholders of the two selling corporations and of the board of directors and executive committee of Interstate United corporation."

■ The rule on measure of damages is easily stated but difficult of application. All authorities agree that the person aggrieved by a breach is entitled to

be put where he would have been had the contract been performed, the status to be determined by the net amount of loss caused and gains prevented by the defendant's breach, in excess of savings made possible. 5 Corbin on Contracts §§ 992, 1002 (1964); Restatement of Contracts § 329 (1932); Liberty Navigation and T. Co. v. Kinoshita & Co., Ltd., Tokyo, 285 F.2d 343, 350 (2nd Cir. 1960). These working rules "are never capable of exact and perfect application." 5 Corbin on Contracts § 992 (1964).

■ The court instructed the jury that if they found for the plaintiff White, appellee herein, he was entitled to recover the difference between the contract price and the value of the business at the time of the breach. In determining the value of the business the jury was instructed they could take into consideration the future profits, the market value of the machines, the reasonable value of the advantages of their locations and the goodwill associated therewith, if any, which the purchaser may have gained in the sale. This is in accord with the applicable rule.

The business to be sold was an automatic vending machine business with vending machines located in strategic places where people were apt to patronize them. Since it was an established business a "reasonable prediction" could be "made as to its future on the basis of its past history." 5 Corbin on Contracts § 1023 (1964). In this regard a determination of the business value was made on the basis of the estimated gross income which was determined by past and projected sales multiplied by estimated earnings of 7%, multiplied again by a rule of thumb multiplier of between 5 and 15 which was supplied by expert opinion. White, as well as other qualified witnesses, applied this formula.

White claimed $100,000.00 for past services. The agreed contract price was $276,000.00. Under this proof and by applying the loss of gain formula, the

---

**2.** The agreement contained a provision that the law of Illinois would be the applicable law of the contract: 1965 Ill.Rev., Stat., Ch. 26, §§ 1–206, 2–201; Ch. 59, § 1, 2.

jury could properly determine that the difference between the value of business on the date of the breach and the contract price was $165,000.00.

The damage theory was properly submitted and the verdict is within the proof.

Affirmed.