OTSUKA ELECTRONICS (USA, INC.),
Plaintiff and Appellee,

v.

IMAGING SPECIALISTS, INC., a Utah
corporation; Mark H. Levy; John R.
Merendino; and Richard M. Taylor, Defendants and Appellants.

No. 960337–CA.

Court of Appeals of Utah.

April 17, 1997.

Rehearing Denied May 16, 1997.

Wesley F. Sine, Robert M. Anderson, Jennifer K. Anderson, Salt Lake City, and Paul Levy, Chevy Chase, MD, for Defendants and Appellants.

Gary E. Doctorman and Marji Hanson, Salt Lake City, for Plaintiff and Appellee.

Before DAVIS, P.J., WILKINS, Associate P.J., and ORME, JJ.

WILKINS, Associate Presiding Judge:

Appellant Imaging Specialists, Inc. (ISI) and appellants Mark H. Levy, John R. Merendino, and Richard M. Taylor (collectively, the Guarantors) appeal the trial court's order that granted appellee Otsuka Electronics' (Otsuka) motion for summary judgment, denied appellants' motion to amend their answer and add counterclaims, and denied appellants' cross-motion for summary judgment. We affirm.

## BACKGROUND

In reviewing a grant of summary judgment, we view the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *See Higgins v. Salt Lake County,* 855 P.2d 231, 233 (Utah 1993). Accordingly, we recite the facts in the light most favorable to appellants. *See id.*

In 1992, ISI expressed an interest in leasing a magnetic resonance imaging (MRI) machine manufactured by Otsuka. In November 1992, after several discussions, Otsuka presented ISI with a signed, written quotation for an Otsuka MRI machine. ISI accepted Otsuka's quotation that same month.

During this same time, Otsuka was communicating with the United States Food and Drug Administration (FDA) regarding its MRI machine. The FDA had informed Otsuka in the summer of 1992 that it could begin to market its MRI machine, but emphasized that the MRI machine had not yet been approved. In January 1993, the FDA initiated a compliance audit of Otsuka's MRI machine. As a result of this audit, Otsuka instructed two doctors who were already using its MRI machine to stop all human scanning for about four days in February 1993. Otsuka then began an internal audit of its MRI machine. As part of its internal audit, Otsuka instructed its salespeople to temporarily stop selling the MRI machines while the audit was conducted. However, Otsuka did not inform appellants of these developments.

Meanwhile, in January 1993, ISI signed a master lease agreement for an Otsuka MRI machine. Two years later, appellants discovered that Otsuka never signed this lease agreement. In February 1993, ISI and the Guarantors also signed corporate and personal guarantees. ISI then began expensive construction on the facility where the Otsuka MRI machine would be installed. In March 1993, Otsuka sent ISI a letter confirming that it would ship the MRI machine to ISI in late May 1993.

However, in May 1993, Otsuka received a letter from the FDA regarding the Otsuka MRI machine. The letter notified Otsuka that it was violating federal regulations. The

FDA threatened to bring an action to enjoin Otsuka from engaging in any further business transactions with respect to the Otsuka MRI machine. Otsuka did not disclose this warning letter to appellants.

In early August 1993, Otsuka sent ISI a letter informing it that Otsuka could not deliver the MRI machine at that time. The letter acknowledged that ISI had advised Otsuka that it could not wait until the unknown time when Otsuka could deliver one of its MRI machines, because ISI intended to have the MRI machine installed and functioning by the ski season that winter. Because of this situation, Otsuka offered to terminate the parties' old agreement regarding an Otsuka-manufactured MRI machine and to enter into a new agreement for Otsuka to provide ISI with an MRI machine manufactured by Siemens Medical Systems, Inc. (Siemens). ISI agreed to the new arrangement. Both parties then signed an amended master lease agreement, under which ISI would lease a Siemens MRI machine from Otsuka. In order to accommodate the physical requirements of the Siemens MRI machine, ISI's facility required additional construction. As a result, ISI was required to extend its financing.

In August 1993, Otsuka assigned all of its interest in ISI's lease to ORIX USA Corporation (ORIX).[1] The Siemens MRI machine was then delivered to ISI in September 1993.

ISI eventually defaulted on the lease agreement. As a result, ORIX demanded immediate payment of ISI's indebtedness under the lease and demanded that the Guarantors honor their guarantees. ISI and the Guarantors failed to cure the delinquent payments.

Because ISI had fallen into default, in July 1994, acknowledging that ISI owed over $87,000 under the lease, over $5000 in sales and use taxes, and over $35,000 for equipment maintenance, appellants signed a forbearance agreement with Otsuka. Under the forbearance agreement, Otsuka agreed to pay a portion of the total amount of ISI's indebtedness then owed to ORIX, provided that ISI

and the Guarantors agreed to directly repay Otsuka by August 19, 1994. The forbearance agreement also contained the following release agreement (release):

> [ISI] and [the] Guarantors hereby waive and release any known or unknown claims, causes of action, or suits ("Claims") of any kind, character or nature whatsoever fixed or contingent, which [ISI] or [the] Guarantors may have or claim against ORIX or Otsuka which may arise out of or be connected with any acts of commission or omission by ORIX or Otsuka existing or occurring on or prior to the date of this Forbearance Agreement, including, without limitation, any Claims arising with respect to the Equipment Lease, Related Documents or the collateral or the Guaranties.

ISI continued to experience financial difficulties and failed to comply with the forbearance agreement. Therefore, Otsuka accelerated the entire balance due on the lease and demanded payment in January 1995. Appellants failed to make any payments. Otsuka then initiated this action against appellants in February 1995, seeking to recover the money appellants owed it. Otsuka then filed a motion for summary judgment.

After the initial discovery was conducted, appellants filed a motion for a continuance and a motion to compel because Otsuka had been unresponsive to many of their interrogatories. The court granted the motion to compel, ordering Otsuka to fully respond to appellants' discovery requests within twenty days.

During the additional discovery time, appellants discovered information regarding the FDA compliance audit and Otsuka's internal audit. Because this was the first time they had learned of the audits, appellants moved to amend their answer and to add counterclaims. Among other changes, appellants sought to add an affirmative defense of fraud and fraud-in-the-inducement, and to add as counterclaims common law fraud and fraud-in-the-inducement and breach of the

---

1. Otsuka repurchased the lease in December 1994, and at the time this suit was brought

owned all rights as lessor under the lease.

implied covenant of good faith and fair dealing. Appellants alleged that Otsuka's apparent violations of the FDA regulations and internal manufacturing difficulties had created a situation in which Otsuka knew that it could not timely deliver an Otsuka MRI machine as it had represented to ISI, and that therefore, Otsuka had not negotiated in good faith. Appellants further alleged that they were deceived by Otsuka's misrepresentations and omissions. Appellants contend that if they had been aware of the FDA audit, the FDA's concerns with Otsuka's MRI machine, and therefore the true status of the Otsuka MRI machine, they would not have entered into the guarantees, lease agreements, and forbearance agreement. Appellants also filed a cross-motion for summary judgment.

In March 1996, the trial court granted Otsuka's motion for summary judgment, denied appellants' motions to amend and add counterclaims, denied appellants' cross-motion for summary judgment, and entered judgment in favor of Otsuka. Appellants appeal.

## ISSUES AND STANDARDS OF REVIEW

Appellants argue the trial court erred in granting Otsuka's motion for summary judgment and denying their cross-motion for summary judgment. Summary judgment may be granted only if the record shows that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Utah R. Civ. P. 56(c). "Because entitlement to summary judgment is a question of law, we accord no deference to the trial court's resolution of the legal issues presented." *K & T, Inc. v. Koroulis*, 888 P.2d 623, 627 (Utah 1994).

■ In examining the trial court's order granting summary judgment to Otsuka, " '[w]e determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact.' " *Id.* (citation omitted). We may affirm a grant of summary judgment on any ground available to the trial court, even if it is one not relied upon by the trial court. *See Higgins*, 855 P.2d at 235. In examining the court's denial of appellants' cross-motion for summary judgment, we review for correctness the trial court's conclusion that appellants were not entitled to judgment as a matter of law. *See Salt Lake City v. Silver Fork Pipeline Corp.*, 913 P.2d 731, 733 (Utah 1995) ("A trial court's decision to grant or deny a motion for summary judgment is a legal one and will be reviewed for correctness.").

■ As a part of their argument that the trial court erred in granting Otsuka's motion for summary judgment and denying their cross-motion for summary judgment, appellants assert the trial court erred in denying their motion to amend their answer and add counterclaims. We will not overturn a trial court's denial of a motion to amend a pleading absent an abuse of discretion. *See Timm v. Dewsnup*, 921 P.2d 1381, 1389 (Utah 1996).

## ANALYSIS

Appellants argue the trial court erred in granting Otsuka's motion for summary judgment and in denying their motion for summary judgment. Appellants also argue the trial court abused its discretion in denying their motion to add the affirmative defense of fraud and the counterclaims to their answer.

Appellants do not challenge the trial court's grant of Otsuka's motion for summary judgment by attacking the sufficiency of Otsuka's claim. Instead, appellants' challenge is based entirely on their proposed affirmative defense of fraud. As a result, if appellants cannot add the affirmative defense of fraud to their answer, they will not be able to make the only argument they have against the trial court's order granting summary judgment. As such, the success of appellants' challenge of the summary judgment order is contingent on the success of their challenge of the trial court's denial of their motion to add their affirmative defense to their answer.

Furthermore, appellants' argument that the trial court erred in denying their motion for summary judgment is likewise based entirely on their proposed affirmative defense and counterclaims. Therefore, if we conclude the trial court did not abuse its discre-

tion in denying appellants' motion to add the affirmative defense and counterclaims to their answer, we must necessarily conclude the trial court did not err in denying their motion for summary judgment.

Therefore, in determining whether the trial court erred in granting Otsuka's motion for summary judgment and denying appellants', we examine whether the trial court abused its discretion in denying appellants' motion to amend, by which they would add the proposed affirmative defense and counterclaims. Because we conclude the trial court did not abuse its discretion in denying the motion to amend, we also conclude the trial court did not err both in granting Otsuka's motion for summary judgment and in denying appellants'.

## I. Appellants' Proposed Affirmative Defense

■ We first address whether the trial court abused its discretion in denying appellants' request to add their affirmative defense of fraud.

■ To successfully show the trial court abused its discretion, appellants must show the fraud defense is legally sufficient. *See Timm*, 921 P.2d at 1389 ("[A] motion to amend should not be granted where the pleader does not set forth a legally sufficient claim."); *cf.* Utah R. Civ. P. 8(a) (pleading must contain "short and plain statement of the claim showing that the pleader is entitled to relief"). To show their fraud defense is legally sufficient, appellants must state with particularity the circumstances supporting each element of fraud. *See* Utah R. Civ. P. 9(b) ("In all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity."); *DeBry v. Noble*, 889 P.2d 428, 443 (Utah 1995) (stating "the [plaintiffs] failed to allege a valid claim for relief of fraud because they did not allege with particularity facts necessary to make all their elements of fraud"); *Union Bank v. Swenson*, 707 P.2d 663, 669 (Utah 1985) (stating that Rule 9(b) requires that substance of acts constituting fraud must be pleaded with particularity, but does not require averment to use specific terminology of fraud and its elements); *Heathman v. Hatch*, 13 Utah 2d

266, 268, 372 P.2d 990, 991 (1962) (stating that to withstand motion to dismiss, basic facts of fraud "must be set forth with sufficient particularity to show what facts are claimed to constitute" fraud charge). The elements of fraud are:

(1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*Pace v. Parrish*, 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952); *accord Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066–67 (Utah 1996).

Appellants seek to assert the fraud defense in order to defend against the suit brought against them by Otsuka. Otsuka's claim is based on the obligations appellants incurred when they signed the forbearance agreement and the two sets of documents incorporated into the forbearance agreement, namely the guarantees and amended lease agreement. Thus, because appellants are defending against a suit brought under the forbearance agreement, their fraud defense must relate to the forbearance agreement, as that is the basis upon which they are being sued.

Appellants allege as their fraud defense that Otsuka, knowing of the FDA problems, knew or should have known that they could not timely deliver an Otsuka MRI machine to ISI. Knowing they could not timely deliver the machine, Otsuka nonetheless misrepresented to appellants that it could timely deliver the machine and thereby induced appellants into signing the guarantees, amended lease agreement, and forbearance agreement. Appellants also allege damages resulting from their acting upon Otsuka's misrepresentations.

However, even assuming that Otsuka misrepresented that it could timely deliver the MRI machine to ISI, we conclude as a mat-

ter of law that appellants could not and did not reasonably rely upon Otsuka's misrepresentations when they signed the forbearance and amended lease agreements. *See Gold Standard*, 915 P.2d at 1067 (stating that courts, in some instances, may conclude as matter of law that there was no reasonable reliance). The misrepresentation appellants allege is Otsuka's misrepresentation that it could timely deliver an Otsuka MRI machine to appellants. However, appellants obviously knew Otsuka could not timely deliver an Otsuka MRI machine when appellants signed the amended lease agreement. Appellants admit that before they signed the amended lease agreement, Otsuka informed them it could not timely deliver an Otsuka MRI machine. Appellants also admit that they agreed to lease the Siemens, rather than the Otsuka, MRI machine under the amended lease agreement because they knew Otsuka could not timely deliver its own machine to ISI. Appellants, of course, also knew eleven months later, when they signed the forbearance agreement, that Otsuka had not been able to timely deliver an Otsuka MRI machine. Therefore, appellants knew Otsuka could not timely deliver its MRI machine when appellants signed both the forbearance and the amended lease agreements. Thus, appellants did not "ac[t] reasonably and in ignorance of [the] falsity," *Pace*, 247 P.2d at 275, relating to Otsuka's inability to timely deliver an Otsuka MRI machine. *See Gold Standard*, 915 P.2d at 1068–69 (citing with approval case stating that reliance cannot be reasonable when aware of falsity of misrepresentation). The fact that appellants did not know the reason why Otsuka could not timely deliver its MRI machine is irrelevant to our analysis; for appellants' fraud defense to be successful, appellants could not have known of the falsity of Otsuka's earlier representations that it could timely deliver its MRI machine. *Cf. Pace*, 247 P.2d at 275 (stating

that where plaintiff examined field with shovel and could see soil was rocky, plaintiff could not reasonably rely on defendant's misrepresentation that field's soil was good quality and highly productive).

Because appellants could not, as a matter of law, have reasonably relied on Otsuka's misrepresentations when appellants signed the amended lease and forbearance agreements, their fraud defense to Otsuka's claim is legally deficient.[2] As such, we hold the trial court did not abuse its discretion in denying appellants' motion to add this legally deficient defense to their answer.[3]

## II. Appellants' Proposed Counterclaims

We next address appellants' argument that the trial court erred in denying their motion to add the counterclaims of fraud and breach of the implied covenant of good faith and fair dealing to their answer. Otsuka counters this argument by asserting that the trial court did not err in denying appellants' motion to add these counterclaims because the release in the forbearance agreement bars appellants from bringing these counterclaims. We therefore address Otsuka's argument that the release bars appellants' counterclaims.

■ The release bars appellants from asserting any "claims, causes of action, or suits" that "may arise out of or be connected with any acts of commission or omission by ... Otsuka existing or occurring on or prior to the date of this Forbearance Agreement." It is undisputed that appellants' proposed counterclaims arose out of acts occurring prior to the day appellants signed the forbearance agreement. Moreover, although counterclaims are not specifically itemized in the release, the plain and ordinary meaning of a "counterclaim" is that it is a type of "claim."

---

**2.** Otsuka argues that appellants' affirmative defense is barred by the release in the forbearance agreement; however, it is unclear whether the language of the release barring "any known or unknown claims, causes of action, or suits" bars defenses. Because neither party has briefed whether the release's language bars affirmative defenses, and because we conclude the fraud defense is not legally sufficient, we do not reach this issue.

**3.** Appellants also assert the trial court erred in granting Otsuka's motion for summary judgment because Otsuka breached the implied covenant of good faith and fair dealing. We cannot agree. No evidence of a breach of the contracts Otsuka sued upon, namely the forbearance and amended lease agreements, was shown.

*See Black's Law Dictionary* 349 (6th ed. 1990) (defining "counterclaim" as "[a] claim presented by a defendant in opposition to or deduction from the claim of the plaintiff"); *see also Hall v. Process Instruments & Control, Inc.,* 866 P.2d 604, 606 (Utah.Ct.App. 1993) (stating that unambiguous contract terms are interpreted " ' "according to their plain and ordinary meaning" ' " (citations omitted)), *aff'd,* 890 P.2d 1024 (Utah 1995). Therefore, the release bars counterclaims, such as those asserted by appellants, that arose from acts that occurred before appellants signed the forbearance agreement.

▮▮▮▮ However, the law vitiates contractual clauses that limit liability, such as the release in the forbearance agreement, if they are procured by fraud. *See Lamb v. Bangart,* 525 P.2d 602, 608 (Utah 1974). Therefore, appellants' counterclaims are not barred by the release if the release was procured by fraud. The Utah Supreme Court explained this rule in *Lamb:* "[A] contract clause limiting liability will not be applied in a fraud action. The law does not permit a covenant of immunity which will protect a person against his own fraud on the ground of public policy." *Id.*

▮▮▮▮ To successfully argue the release is invalid because it was procured by fraud, appellants must successfully establish a legally sufficient claim of fraud. *Cf. Lamb,* 525 P.2d at 608 ("A contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud."). To successfully establish fraud, appellants must state with particularity facts establishing that a sufficient causal connection exists between Otsuka's alleged fraud and the procurement of the release in the forbearance agreement. *See* Utah R. Civ. P. 9(b); *Heathman,* 372 P.2d at 991; *cf. Larson v. Overland Thrift & Loan,* 818 P.2d 1316, 1323 (Utah.Ct.App. 1991). Appellants rely on *Ong International (U.S.A.) Inc. v. 11th Avenue Corp.,* 850 P.2d 447 (Utah 1993), to prove this causal connection.

*Ong* involved fraudulent misrepresentations made regarding a mausoleum. Of the 510 crypts in the mausoleum, fifty-one were concrete, 153 were of a concrete and wood mixture, and 306 were wood. *See id.* at 449.

Each crypt was then covered with a marble facing that had to be removed to see the construction components. *See id.* However, on each of the plaintiffs' three tours of the mausoleum, which were made between April 1987 and April 1988, the defendant showed the plaintiffs a concrete model crypt and told them that it was representative of all the mausoleum's crypts. *See id.* at 450. Based on these representations, the defendant and the plaintiffs entered into a partnership agreement in May 1988. *See id.* About a year later, the parties entered into a partnership redemption agreement, whereby the plaintiffs purchased the defendant's interest in the mausoleum. *See id.* The redemption agreement contained a clause releasing the parties from all claims and causes of action based on their association with the partnership. *See id.*

Then, in May 1990, one of the plaintiffs removed the marble facing on several crypts and discovered that a large number were made of wood and some had no drainage. *See id.* at 450–51. The plaintiffs, unable to sell any of the nonconcrete crypts, brought suit against the defendant. *See id.* at 451.

The Utah Supreme Court explained that the plaintiffs had alleged, and the jury had found, the "defendants committed fraud against the plaintiffs in the sale of the mausoleum under *both* the purchase and the redemption agreements." *Id.* at 453 (emphasis added). The court concluded that the procurement of the release was therefore "an integral and continuing part of defendants' willful misrepresentations and omissions concerning the construction of the crypts plaintiffs purchased. It [could not] be separated from the fraudulently induced contract in which it [was] contained." *Id.*

Appellants argue that, as in *Ong,* the procurement of the release contained in the forbearance agreement was an integral part of Otsuka's fraudulent scheme of misrepresentations and omissions concerning its ability to timely deliver an Otsuka MRI machine to appellants. Appellants rely on this theory of a continuing fraudulent scheme to establish that a sufficient nexus exists between Otsuka's alleged fraud and the procurement

of the release contained in the forbearance agreement.

However, appellants' case is distinguishable from *Ong*. In *Ong*, the plaintiffs proved the existence of a continuing fraudulent scheme, of which the procurement of the redemption agreement containing the release was an integral part. *See id.* at 450. The plaintiffs proved that the essence of the defendant's fraudulent scheme—the existence of many nonconcrete crypts in the mausoleum—was not discovered until over a year after signing the redemption agreement containing the release. Therefore, the plaintiffs had been induced to enter into both the partnership and redemption agreements because they understood when they signed both of those agreements that the mausoleum contained only concrete crypts. *See id.* at 453. Appellants, however, have failed to show that the procurement of the forbearance agreement, which contains the release, was an integral part of Otsuka's alleged fraudulent scheme. The essence of the fraudulent scheme appellants allege is Otsuka's inability to timely deliver an Otsuka MRI machine to appellants. However, unlike the situation in *Ong*, appellants knew of Otsuka's inability to timely deliver an Otsuka MRI machine when they signed the amended lease agreement in August 1993. As such, in July 1994, when appellants signed the forbearance agreement, by which they agreed to waive any claims against Otsuka, they had known for at least eleven months the essence of their fraud claim—that Otsuka had been unable to timely deliver the Otsuka MRI machine that appellants had originally bargained for.

Thus, unlike in *Ong*, appellants have not proven that the procurement of the release was an integral part of Otsuka's fraudulent scheme; rather, the evidence indicates that Otsuka's alleged fraudulent scheme ended in August 1993, when appellants entered into the amended lease agreement, whereby they agreed to lease a Siemens, rather than an Otsuka, MRI machine. Even accepting as true all of the evidence supporting appellants' claim of Otsuka's fraud, appellants have failed to establish the existence of any meaningful causal link between Otsuka's fraudulent scheme and the procurement of the release in the forbearance agreement. *Cf. Gold Standard*, 915 P.2d at 1069 n. 2 (noting that because trial court concluded appellant did not establish sufficient nexus between fraudulent promises relied upon and loss claimed, it properly concluded appellant's damages did not result from their reliance on appellees' alleged fraudulent promises).

Although this case is different from *Ong*, it is comparable to *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295 (5th Cir. 1983), which was recognized and accepted in *Ong*. *See Ong*, 850 P.2d at 453 ("We believe that the *Ingram* decision is in accord with our policy set forth in *Lamb[ v. Bangart*, 525 P.2d 602 (Utah 1974),] of vitiating agreements, including releases, premised on fraud."). Ingram, a large, worldwide marine construction and contracting firm, sold its assets to McDermott, its competitor, in November 1971 because it was facing insolvency. *See Ingram*, 698 F.2d at 1299–1300. Because numerous contract disputes arose between them after the initial agreement, the parties signed a settlement agreement in May 1973, which contained an agreement to settle all claims between the parties in connection with the sale of all of Ingram's assets. *See id.* at 1300–01. The settlement agreement released McDermott "from all claims except for the claims expressly reserved in the releases." *Id.* at 1302.

Five years later, McDermott was indicted by a federal grand jury for antitrust violations and other illegal activities. *See id.* Ingram then initiated suit against McDermott, contending that it was driven to sell its assets by McDermott's bid-rigging conspiracy, and that the releases were vitiated due to fraud. *See id.* at 1299, 1302. The Fifth Circuit held, based on federal antitrust law, that Ingram's claims were barred by the releases. *See id.* at 1323. The court determined Ingram failed to show that "during the [release] negotiations McDermott misrepresented material facts or concealed facts which would materially qualify those already stated," *id.* at 1314, and "[t]he nexus between [the alleged misrepresentations] and the release negotiations [was] far too attenuated to

be of probative value," *id.* at 1315. The court concluded:

> Thus, the facts demonstrate that the releases were procured after nearly two years of negotiations over disputes "arising from" the sale of Ingram's marine construction business in 1971. This was *after* Ingram had left the business. The releases clearly were not designed to force Ingram out of the business. It already was. Neither were the releases essential to McDermott acquiring Ingram's business. It had already accomplished this. The releases were an outgrowth—a result, not a cause of the acquisition. Ingram made the offer to settle. McDermott accepted. Under these circumstances ... Ingram should not be allowed to undermine the provisions of valid releases to which it agreed.

*Id.* at 1315–16.

The same observations and conclusions can be made in this case about the causal connection between Otsuka's fraud and the procurement of the release. The release contained in the forbearance agreement was procured over eleven months after appellants signed the amended lease agreement with Otsuka. This was *after* appellants had agreed to accept the Siemens MRI machine rather than the Otsuka MRI machine, knowing full well of the delay involved in awaiting an Otsuka unit (although being in the dark about *why* such a delay had come about). Therefore, the release was not designed to force appellants to accept a type of MRI machine different than an Otsuka MRI machine, because they already had accepted the Siemens MRI machine. The forbearance agreement containing the release was an outgrowth or result, not a cause, of the amended lease agreement by which ISI committed to lease the Siemens MRI machine. Therefore, we conclude appellants have not shown the release was procured by fraud.

■ Because appellants have not shown the release was procured by fraud, we conclude that the release bars appellants from asserting their proposed counterclaims, which arose from acts that occurred before appellants signed the forbearance agreement containing the release. Therefore, we hold

the trial court did not abuse its discretion in denying appellants' motion to add to their answer counterclaims that are barred by the release. *Cf. Timm,* 921 P.2d at 1389 ("[A] motion to amend should not be granted where the pleader does not set forth a legally sufficient claim.").

### CONCLUSION

We hold the trial court did not abuse its discretion in denying appellants' motion to amend their answer and add counterclaims. Appellants' affirmative defense of fraud is legally deficient because appellants could not have reasonably relied on Otsuka's misrepresentation, and appellants' proposed counterclaims are barred by the release in the forbearance agreement. Therefore, we also hold the trial court did not err in granting Otsuka's motion for summary judgment and in denying appellants' cross-motion for summary judgment.

Affirmed.

ORME, J., concurs.

DAVIS, Presiding Judge (concurring):

I concur with the majority opinion and write separately to express my view that a claim of fraud, whether asserted by way of complaint, counterclaim, and/or affirmative defense is, nonetheless, a claim. The release bars any "claims, causes of action, or suits." Appellants' affirmative defense, therefore, falls within the terms of the release.