**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNISHIPPERS GLOBAL LOGISTICS,
LLC, a Delaware limited liability
company,

      Plaintiff-Appellee/Cross-Appellant,

v.

DHL EXPRESS (USA), INC., an Ohio
corporation,

      Defendant-Appellant/Cross-
Appellee.

Nos. 11-4216 and 12-4008
(D.C. No. 2:08-CV-00894-DAK)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, **LUCERO**, and **HARTZ**, Circuit Judges.

Unishippers Global Logistics, LLC ("Unishippers") filed suit against DHL

Express (USA), Inc. ("DHL"), alleging that DHL breached the parties' agreements by

restructuring and failing to provide proper notice. The district court granted partial

summary judgment to Unishippers on its notice claim and denied DHL's motion for

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 32.1.

partial summary judgment. It also denied DHL's motion to limit damages evidence at trial. After trial, the jury returned a special verdict awarding Unishippers $2.5 million on its restructuring claim and $27,903,865 on its notice claim, $3 million of which concerned damages for the contractual notice period, and $24,903,865 of which pertained to the time period beyond the notice period. DHL appeals, and Unishippers conditionally cross-appeals.

We affirm the district court's grant of partial summary judgment to Unishippers on its notice claim. We also affirm the denial of DHL's motion for judgment as a matter of law on its restructuring claim. However, we reverse the award of damages beyond the contractual notice period and thus vacate the $24,903,865 in damages. We need not reach Unishippers' remaining claims. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

**I**

Headquartered in Salt Lake City, Utah, Unishippers franchises its shipping and freight business system throughout the United States. In 1994, Unishippers and Airborne Freight Corporation entered into the National Account Agreement ("NAA"), which stated that Airborne would provide expedited shipping services for the Unishippers franchise system and its customers. In 2003, DHL acquired Airborne and assumed Airborne's rights and obligations under the NAA.

Pursuant to the NAA, DHL was required to provide Unishippers with "Transportation Services" within "the parameters of the general conditions of its Service

Guide in effect at the time each shipment is tendered." Airborne and later DHL separately published a guide that listed service offerings and locations, which was updated periodically to reflect changes in service. The NAA could not be terminated except for good cause "in the event of a material breach" by the other party and after an opportunity to cure. It also contained an integration clause stating that "[t]his Agreement constitutes the whole contract between the parties and neither party is bound by any other expressions or representations made by either party, their agents or any other party." On July 11, 2007, DHL extended the NAA with Unishippers through September 20, 2017.

Beginning in the latter half of 2007, DHL began considering withdrawal from the United States domestic market. However, DHL repeatedly provided reassurances to Unishippers that it would not be withdrawing. On May 28, 2008, DHL announced that it would be limiting services in low population density areas in the United States. According to Unishippers, this so-called "White Space" restructuring ultimately resulted in an approximate thirty-five percent reduction in Unishippers' business.

In response to this reduction, Unishippers sought another domestic shipping partner. However, the NAA provided for termination of the agreement if Unishippers' franchisees failed to use DHL's domestic services exclusively. The parties entered into a Reseller Agreement on October 6, 2008, which released Unishippers from its exclusivity obligation. Under the agreement, Unishippers could terminate the contract at any time without cause upon ninety days' notice, and DHL could similarly terminate at any time without cause by giving 180 days' notice. The agreement also stated that "no other

-3-

amendments or ancillary documents" other than those specifically included in the NAA would apply.

On October 22, 2008, Unishippers finalized an agreement with United Parcel Service ("UPS"), which provided that UPS would become Unishippers' exclusive express shipping carrier for both domestic and international shipments by October 22, 2009.

In a letter dated November 10, 2008, DHL informed Unishippers that it would cease providing domestic services on January 30, 2009. DHL further stated that it would cease domestic services on December 10, 2008 for Unishippers' customers who had not regularly shipped internationally through DHL. DHL also notified Unishippers that it would be terminating the Reseller Agreement pursuant to the 180-day notice provision in May 2009.

Unishippers filed suit against DHL, alleging that DHL breached the NAA and the Reseller Agreement by withdrawing from the United States domestic market as part of its restructuring plan and by failing to give Unishippers 180 days' notice. The district court granted partial summary judgment to Unishippers on its 180-day notice claim and denied DHL's motion for partial summary judgment on Unishippers' restructuring claim. It also denied DHL's motion to limit damages evidence to the 180-day notice period or to the period before UPS became Unishippers' exclusive shipping supplier. Finally, the district court granted DHL's motion to dismiss Unishippers' claim for rescission of the Reseller Agreement.

The district court instructed the jury that it could award damages extending beyond the 180-day notice period if the jury determined that DHL was "equitably estopped" from asserting the 180-day notice provision as a damages limitation. The court also instructed the jury that it could award damages beyond 180 days if it found that "DHL breached the contractual provision to act in good faith."

After the jury found that DHL's "White Space" restructuring plan breached the contract and that Unishippers was entitled to damages beyond the 180-day notice period, it returned a special verdict awarding Unishippers $2.5 million in damages for DHL's "White Space" reductions, $3 million in damages for the 180-day notice period, and $24,903,865 for the time period beyond the 180-day notice period. Unishippers also received attorney's fees and costs totaling $1.7 million. The district court denied DHL's post-trial motions for judgment as a matter of law and a new trial. DHL appealed and Unishippers filed a conditional cross-appeal based on the district court's dismissal of its rescission claim.

## II

Because this case comes to us from the District of Utah, Utah state law controls our choice-of-law analysis. Salt Lake Tribune Publ'g Co. v. Mgmt. Planning, Inc., 390 F.3d 684, 692 (10th Cir. 2004). Utah courts "apply the 'most significant relationship' approach as described in the Restatement (Second) of Conflict of Laws in determining which state's laws should apply to a given circumstance." Id. at 693 (quoting Waddoups v. Amalgamated Sugar Co., 54 P.3d 1054, 1059 (Utah 2002)). In contract disputes, Utah

courts consider:  (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties.  Id. (citing Morris v. Health Net of California, Inc., 988 P.2d 940, 942 (Utah 1999); Restatement (Second) of Conflict of Laws § 188).

We conclude that Utah law should govern our interpretation of the NAA and Reseller Agreement.  Regarding the first factor, the place of contracting, Utah and Florida both have relationships to the contract.  With respect to the second factor, the record does not reveal where the parties were located when they negotiated all of the terms of the agreements.  As to the third and fourth factors, the agreements were for shipping services to be performed across the United States.  Finally, in terms of the last factor, Unishippers is a Utah Corporation with its principal place of business in Utah, and DHL is a Delaware corporation with its principal place of business in Florida.  Because Utah edges out the other possible locations in our review of the relevant factors, we conclude that Utah has the most significant relationship to the NAA and Reseller Agreement.

**A**

We first turn to the district court's grant of partial summary judgment to Unishippers on the claim that DHL breached the parties' agreement by failing to give 180 days' notice that it was ceasing domestic shipping operations.  We review a grant of summary judgment de novo, applying the same legal standards used below.  Gillogly v. Gen. Elec. Capital Assurance Co., 430 F.3d 1284, 1286, 1293 (10th Cir. 2005).

Under Utah law, courts look "to the language of the contract to determine its meaning and the intent of the contracting parties." Café Rio, Inc. v. Larkin-Gifford-Overton, LLC, 207 P.3d 1235, 1240 (Utah 2009). Utah courts "consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." Id. If "the language within the four corners of the contract is unambiguous," then courts determine the parties' intentions "from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." Id. (quotation omitted). "Only if the language of the contract is ambiguous will [courts] consider extrinsic evidence of the parties' intent." Id. The Utah Supreme Court has explained that "ambiguity exists in a contract term or provision if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." WebBank v. Am. Gen. Annuity Serv. Corp., 54 P.3d 1139, 1145 (Utah 2002) (quotation omitted). If a party "has bound itself through textually unambiguous language, . . . it is not within th[e] court's purview to bind it to more." Saleh v. Farmers Ins. Exch., 133 P.3d 428, 434 (Utah 2006).

> The relevant portions of the NAA recite the following:
>
> Whereas, [DHL] is a domestic and international air express and air freight forwarder conducting business pursuant to, and in accordance with, operating authority issued by the U.S. Department of Transportation . . . .
>
> Whereas, [Unishippers], as a franchised system, and the [Unishippers] Franchisees are, throughout the United States, in the business of offering the services of overnight air express and heavy freight to [Unishippers] [c]ustomers within the United States and internationally.

-7-

Whereas, [Unishippers] wishes to offer the services of [DHL] to [Unishippers] [c]ustomers and potential [Unishippers] customers within the United States and [i]nternationally.

Whereas, [DHL] wishes to have [Unishippers] offer its services with the terms and conditions of this Agreement to [Unishippers] [c]ustomers and potential [Unishippers] [c]ustomers within the United States and [i]nternationally.

In addition, the NAA states that DHL agreed to "cooperate with [Unishipper's] plan to expand and grow in customer base and franchise locations throughout the United States."

The Reseller Agreement states that "[e]xcept as specifically altered by the provisions above, all other terms and conditions of the [NAA] shall apply." It also states that "DHL may terminate this Agreement at any time, without cause, by giving one hundred and eighty (180) days advance written notice to RESELLER." The question before us is whether cessation of domestic shipping services constitutes a termination of the Reseller Agreement that would require 180 days' notice.

On November 10, 2008, DHL informed Unishippers that it would cease providing all domestic services on January 30, 2009 and notified Unishippers that it would be terminating the Reseller Agreement pursuant to the 180-day notice provision in May 2009. DHL contends that although it was obligated to provide 180 days' notice of the termination of the Reseller Agreement, that obligation did not extend to cessation of domestic shipping services.

We disagree. We look to the agreement "as a whole and to the circumstances, nature, and purpose of the contract." Peirce v. Peirce, 994 P.2d 193, 198 (Utah 2000) (citation omitted). In the case at bar, we thus look not only to the Reseller Agreement,

-8-

but also to the NAA that is unambiguously incorporated into the Reseller Agreement. "[C]onsider[ing] each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none," Café Rio, 207 P.3d at 1240, we see no reason to withhold effect from the Reseller Agreement's provision that "[e]xcept as specifically altered by the provisions above, all other terms and conditions of the [NAA] shall apply."

In considering the nature and purpose of the NAA, see Peirce, 994 P.2d at 198, DHL's obligation to provide domestic shipping services appears unambiguous within the four corners of the contract, see Café Rio, 207 P.3d at 1240. First, Sections 1.04, 3.01, and 5.03 of the NAA explicitly contemplated that DHL would provide "door to door expedited pickup and delivery of time sensitive documents and packages" for Unishippers, its franchisees, and their customers, "in accordance with, and to the full extent of, this Agreement." And as stated above, the agreement identified DHL as a "domestic" carrier that would provide services to Unishippers' customers within the United States. Moreover, all amendments to the NAA affirmed DHL's role under the NAA as a domestic carrier by incorporating the following phrase: "Whereas, [Unishippers] and [DHL] entered into a National Account Agreement (Agreement) dated September 21, 1994 . . . wherein [DHL] agreed to perform certain domestic air express and air freight forwarding services . . . ." These statements do not appear to us "capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." WebBank, 54 P.3d at 1145 (quotation

omitted).

Further, when signing the NAA, Airborne understood that it was obligated to provide domestic shipping services. Gerald Cameron, the Airborne executive who negotiated the NAA with Unishippers and who also signed the agreement on Airborne's behalf, repeatedly testified that it was understood that Airborne was required to provide domestic shipping services to Unishippers and its franchisees for the length of the agreement. He also testified that the length of the contractual obligation was a central component of the agreement because the parties understood that Unishippers would rely on the long-term shipping agreement to build its franchises within the United States.

That DHL continued to meet its other obligations under the Reseller Agreement does not suggest that domestic services fell outside the notice requirement. DHL's obligation to provide domestic shipping services was clear from the four corners of the NAA and Reseller Agreement, and we see no ambiguity when we consider the nature of the agreement as a whole.

DHL argues that even if the Reseller Agreement could be plausibly interpreted to require 180 days' notice for a cessation of domestic shipping services, the district court's summary judgment ruling must nevertheless be reversed because the Reseller Agreement only required notice when it was being terminated in its entirety, thereby creating a material issue of fact that required a trial. "Language in a written document is ambiguous if the words may be understood to support two or more plausible meanings." Moon v. Moon, 973 P.2d 431, 435 (Utah Ct. App. 1999). However, the Utah Supreme

Court has stated that a proffered alternative interpretation of a contract "must be plausible and reasonable in light of the language used," First Am. Title Ins. Co. v. J.B. Ranch, Inc., 966 P.2d 834, 837 (Utah 1998), and that "to merit consideration as an interpretation that creates an ambiguity, the alternative rendition must be based upon the usual and natural meaning of the language used and may not be the result of a forced or strained construction." Saleh, 133 P.3d at 433 (quotation omitted). Finally, "words and phrases do not qualify as ambiguous simply because one party seeks to endow them with a different interpretation according to his or her own interests." Id. (citations omitted).

DHL's proffered interpretation merely seeks to endow the Reseller Agreement with a "different interpretation according to [DHL's] own interests." Id. As discussed, DHL's obligation to provide domestic shipping services appears to us to be a central component of the NAA, the entirety of which the Reseller Agreement unambiguously incorporates. We accordingly affirm the district court's grant of partial summary judgment and conclude that DHL breached its obligations under the Reseller Agreement by failing to provide 180 days' notice that it was ceasing its domestic services.[1]

**B**

We next consider DHL's appeal of the district court's denial of its motion for judgment as a matter of law. For largely the same reasons discussed above, we affirm the

---

[1] Unishippers claims that DHL has waived its argument that the contract was ambiguous because it agreed that the contract was unambiguous below. Because we determine that the contract is unambiguous, we need not reach this question.

district court's conclusion that DHL's "White Space" reduction of domestic shipping services breached the parties' agreements.[2]

We review a district court's denial of a motion for judgment as a matter of law de novo, applying the same legal standard as the district court. Deters v. Equifax Credit Info. Services, Inc., 202 F.3d 1262, 1268 (10th Cir. 2000). Judgment as a matter of law is warranted "if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Id. (quotation omitted).

On May 28, 2008, DHL announced that it would be limiting services in low population density areas in the United States. According to Unishippers, this so-called "White Space" restructuring ultimately resulted in approximately a thirty-five percent reduction in Unishippers' business.

DHL argues that its implementation of its "White Space" restructuring in May 2008 was contractually permissible because DHL simultaneously amended its "Service Guide in effect at the time" and thereafter provided services consistent with that Service Guide and the services then "offered by [DHL] to its general customer base." According to DHL, its contractual obligations were limited to offering Unishippers, its franchisees,

---

[2] DHL also seeks to appeal from the denial of its motion for partial summary judgment on the "White Space" claim. Subject to certain exceptions, we generally lack jurisdiction to review a denial of summary judgment after trial. See Stewart v. Beach, 701 F.3d 1322, 1329 n.7 (10th Cir. 2012) (we have jurisdiction to review the denial of summary judgment on qualified immunity grounds when such denial presents "abstract issues of law"). Because DHL properly renewed its motion for summary judgment in a Rule 50(b) motion, we address only the district court's denial of the Rule 50(b) motion.

-12-

and their customers "Transportation Services" according to "the Service Guide in effect at the time" of each shipment and at service levels consistent with what DHL provided to "other [DHL] customers" and DHL's "general customer base." "Transportation Services" is defined in the NAA as "door-to-door expedited pickup and delivery . . . as described in the [DHL] Service Guide and this Agreement," and DHL's "Products and Services" are defined to include those services "currently offered by [DHL], to its general customer base."

We disagree with DHL's characterization of its obligations under the contract. The NAA states that DHL "will provide Transportation Services in accordance with, and to the full extent of, this Agreement and the parameters of its Service Guide in effect at the time each shipment is tendered" to DHL. To interpret this section as requiring only that DHL provide services in accordance with the Service Guide would mean that DHL would have no contractual obligations except as it decided at any given time, so long as it amended its Service Guide accordingly. We decline to read such indefiniteness into the agreement. See Peirce, 994 P.2d at 199 n.5 ("One of the commonest kinds of promises too indefinite for legal enforcement is where the promisor retains an unlimited right to decide later the nature or extent of his performance. This unlimited choice in effect destroys the promise and makes it illusory.").

As we concluded in the previous section, DHL's obligation to provide domestic services was unambiguous under the terms of the NAA and the Reseller Agreement. There is no dispute that DHL ceased domestic shipping services and formally informed

-13-

Unishippers of its intention to do so in November 2008. We thus see no reason to disturb the district court's denial of DHL's post-trial motion for judgment as a matter of law on the basis that its "White Space" reduction of domestic shipping services constituted a breach of the contract.

C

DHL next argues that the jury's award of damages should have been limited to the 180-day notice period. We review de novo "whether a district court's jury instructions, considered as a whole, properly stated the applicable law and directed the jury to consider matters within its province." Gardetto v. Mason, 100 F.3d 803, 816 (10th Cir. 1996).

In damages determinations, it is well established that "the person aggrieved by a breach is entitled to be put where he would have been had the contract been performed, the status to be determined by the net amount of loss caused and gains prevented by the defendant's breach, in excess of savings made possible." Interstate United Corp. v. White, 388 F.2d 5, 7 (10th Cir. 1967).

Damages "must be proven with reasonable certainty and the amount by a reasonable though not necessarily precise estimate." Sawyers v. FMA Leasing Co., 722 P.2d 773, 774 (Utah 1986). Therefore, "[t]he evidence must not be so indefinite as to allow the jury to speculate freely as to the amount of damages or lost profits," but "will be deemed sufficient to establish a basis for an award of damages for lost profits where the plaintiff has provided the best evidence available to him under the circumstances." Penelko, Inc. v. John Price Assocs., Inc., 642 P.2d 1229, 1233 (Utah 1982).

-14-

The Utah Court of Appeals has held that when a defendant breaches a contract that is terminable without cause, the plaintiff is only entitled to those damages it incurred during any notice-of-termination period and is not entitled to damages for the remaining term of the contract. ProMark Group, Inc. v. Harris Corp., 860 P.2d 964, 967 (Utah Ct. App. 1993) (deciding that because a contract would only be effective through the notice period after notice of termination was given, plaintiff was limited to recovering lost commissions only through the contractual notice period); accord Osborn v. Commanche Cattle Indus., Inc., 545 P.2d 827, 831 (Okla. Ct. App. 1975) ("[T]he only legally protectable expectation interest in the party to a contract terminable by either party upon notice is the prospect of profit over the length of the notice period.").

In the case at bar, the district court instructed the jury that it could award damages incurred beyond the 180-day notice period if it found that either (a) DHL was "equitably estopped" from relying on the notice provision or (b) DHL engaged in "bad faith" negotiations. Finding that both equitable estoppel and bad faith existed, the jury awarded Unishippers $3 million for damages suffered during the 180-day notice period and $24,903,865 for damages suffered during the time beyond the 180-day notice period.

We conclude the jury instructions were in error. First, there is no dispute that the Reseller Agreement provided that DHL could terminate the agreement without cause by giving 180 days' notice. On November 10, 2008, DHL notified Unishippers in writing that it would be terminating the Reseller Agreement pursuant to the 180-day notice provision in May 2009; therefore, May 10, 2009 was the date the contract could

-15-

permissibly terminate. Allowing Unishippers to recover lost profits through September 2017, the date at which the Reseller Agreement was set to expire, put Unishippers in a better position than it would otherwise have been in. See White, 388 F.2d at 7. Further, the damages calculated beyond the 180-day notice period would be entirely speculative. Penelko, 642 P.2d at 1233.

Second, equitable estoppel applies when a party "represent[s] facts to be one way to get the other to agree, and then change[s] positions later to the other's detriment." Youngblood v. Auto-Owners Ins. Co., 158 P.3d 1088, 1092 (Utah 2007). Three elements are required to prove equitable estoppel: (1) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (2) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act; and (3) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act. Id.

Unishippers was aware that DHL was considering downsizing its domestic shipping services prior to negotiating the Reseller Agreement. When negotiating the Reseller Agreement, Unishippers requested non-exclusivity with DHL so that it could partner with another shipping company for domestic services in anticipation of DHL's withdrawal from the domestic market, as the NAA subjected Unishippers' franchisees to termination for failure to use DHL domestic services exclusively. Accordingly, the October 6, 2008 Reseller Agreement released Unishippers from its exclusivity obligation. In addition, it gave both parties the right to terminate the Reseller Agreement at any time

without cause upon notice. Unishippers then proceeded to finalize an agreement with UPS on October 22, 2008, which provided that UPS would become Unishippers' exclusive express shipping carrier for both domestic and international shipments by October 22, 2009.

We are sympathetic to Unishippers' allegations that DHL misrepresented its intentions to continue to grow in the United States. However, we cannot locate sufficient factual basis for the proposition that Unishippers was induced into entering into the Reseller Agreement by misrepresentation or that Unishippers relied on supposed lies told by DHL in negotiating the Reseller Agreement. At trial, Unishippers asserted that the "only reason" they were seeking "assurances of using another carrier is because [DHL] told us they were staying in the U.S. . . . . [I]f they hadn't lied to us, we would not have been dealing with a provision to address exclusivity or an assurance that they wouldn't have a problem with us getting another carrier for a service they had no intention of providing." But Daniel Lockwood, the CEO of Unishippers, did not testify that allegedly undisclosed information regarding DHL's intentions in the domestic market would have made a difference in his signing the Reseller Agreement. He avers that he signed the agreement "predicated on the lies"; however, he does not identify what such lies were or the way in which he relied on those lies when signing the Reseller Agreement. See Youngblood, 158 P.3d at 1092. Without more, this does not support the district court's decision to allow the jury to award damages based on equitable exceptions.

In fact, Lockwood testified that he was aware that DHL planned more cuts to its

domestic shipping services in the future:

> Charles Brewer told me DHL is still losing money in the U.S. We're going to have to make further restructuring changes to the network. . . . [H]e said, ground was certainly going to be an issue. Ground is just one of the services, is the least expensive service that DHL provides. Certainly ground was a big area that we're losing money. Saturday delivery was likely going to be impacted. . . . I assume Saturday delivery meant eliminating it.

Lockwood also testified that DHL reassured him that it would offer domestic service to

something similar to what DHL had provided before it purchased Airborne:

> I said, can I expect something like, as I said, the service offering that DHL provided before they purchased Airborne, which would be domestic service in 80 or 85 major cities and international service as well. . . . And Charles's response to me was, you can count on something like that.

In addition, Lockwood testified that a DHL officer advised him to move all domestic

shipping to another carrier:

> I asked Charles, what would you do if you were me? And it was almost a comical kind of – well, if I had a carrier and I were you, I would move your business to the other carriers. Service is certainly not going to get good. It is going to get worse.

If Lockwood was aware prior to signing the Reseller Agreement that DHL planned to

significantly diminish its domestic shipping services in the future, then there is

insufficient evidence to support the district court's giving of a jury instruction on

equitable estoppel.

After a thorough review of the record, we cannot conclude that DHL made a

"cold, calculating decision" to "calculate the damages, hold back the truth in their

dealings with Unishippers, and, in effect, trick them into signing an agreement to give up

their damages by never telling them that they knew they were going to pull out of the country anyway."[3] Even if the Reseller Agreement was "improvidently entered into," we see no reason to rewrite it "or to change the bargain indirectly on the basis of supposed equitable principles." Dalton v. Jerico Constr. Co., 642 P.2d 748, 750 (Utah 1982). Thus although we believe DHL's actions with respect to its cessation of domestic shipping services constituted a breach of its agreement, the maximum period of damages Unishippers is entitled to is limited to the period from November 10, 2008 through May 10, 2009, as provided for by the Reseller Agreement's 180-day notice period.

Finally, we conclude that the district court erred in instructing the jury that it could award damages beyond the 180-day notice period if it found that DHL breached the contractual provision to deal with Unishippers in good faith in all aspects of the parties' agreement. The obligation of good faith requires each party to "refrain from actions that will intentionally destroy or injure the other party's right to receive the fruits of the contract." Oakwood Vill. LLC v. Albertsons, Inc., 104 P.3d 1226, 1239 (Utah 2004) (quotation omitted). "To determine the legal duty a contractual party has under this

---

[3] Relatedly, Unishippers briefly asserts that there should be no limitation on damages because "[a] contract limitation on damages or remedies is valid only in the absence of allegations or proof of fraud." Lamb v. Bangart, 525 P.2d 602, 608 (Utah 1974). However, to avoid such a limitation a party "must successfully establish a legally sufficient claim of fraud." Otsuka Electronics (USA, Inc.) v. Imaging Specialists, Inc., 937 P.2d 1274, 1280 (Utah Ct. App. 1997). "To successfully establish fraud, [a party] must state with particularity facts establishing that a sufficient causal connection exists between [the other party's] alleged fraud and the procurement of the release in the . . . agreement." Id. For the same reasons that we conclude that Unishippers has not shown misrepresentation or fraud sufficient for equitable estoppel, we reject this claim.

covenant, a court will assess whether a party's actions are consistent with the agreed common purpose and the justified expectations of the other party" as manifested in the course of dealings, contractual language, and conduct of the parties. Id. at 1239-40 (quotation omitted). The covenant cannot be interpreted to "establish new, independent rights or duties to which the parties did not agree ex ante." Id. at 1240 (citation omitted). It also cannot result in "rights and duties inconsistent with express contractual terms" or force "a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party to the contract." Id. (quotation omitted).

At most, Unishippers argues that DHL failed to act in good faith because "DHL withheld the clarification requested by Unishippers [regarding its domestic shipping services] so that it could get a secondary carrier for areas no longer serviced by DHL." But this does not rise to the level of action so egregious as to constitute a breach of good faith. Moreover, the record demonstrates that Unishippers was aware that DHL was downsizing its domestic services and therefore negotiated the non-exclusivity clause in the Reseller Agreement so that it could contract with UPS for shipping services in the areas from which DHL was planning to withdraw. Unishippers received non-exclusivity and DHL received the right to terminate the agreement without cause upon notice. We cannot conclude that DHL's actions were inconsistent with the "agreed common purpose and the justified expectations" of Unishippers, see Oakwood, 104 P.3d at 1239-40, and we may not invoke the covenant of good faith and fair dealing to "make a better contract for the parties than they have made for themselves," Rio Algom Corp. v. Jimco Ltd., 618

-20-

P.2d 497, 505 (Utah 1980).

Unishippers' has not demonstrated a reason for which lost profits should be calculated beyond the 180-day notice period.[4] Thus we affirm the jury's awards of $2.5 million in damages for DHL's "White Space" restructuring and $3 million for damages suffered by Unishippers during the 180-day notice period; we vacate the $24,903,865 awarded by the district court for the time beyond the 180-day notice period.[5]

**D**

Because we determine that the district court erred in allowing the jury to award damages beyond the Reseller Agreement's 180-day notice period, we do not need to reach DHL's argument that federal law preempts Unishippers' claim based on equitable estoppel or bad faith under the Airline Deregulation Act and the Federal Aviation Administration Authorization Act. See 49 U.S.C. § 41713(b)(1); § 14501(a)(1).

Further, because we conclude that damages should be limited to the 180-day notice period ending on May 10, 2009, we do not need to reach DHL's argument that Unishippers' damage evidence should be limited to damages incurred through October

---

[4] On appeal, DHL makes a cursory argument that equitable estoppel concerns lie in equity and are not within the province of the jury. A review of the record shows that DHL never specifically objected to the jury instructions on this ground; thus DHL has waived this argument. See United States v. Dewitt, 946 F.2d 1497, 1499 (10th Cir. 1991).

[5] DHL also appears to appeal the denial of its motion in limine seeking to limit damages evidence to the 180-day notice period; however, because we hold that the jury instructions permitting consideration of damages past the 180-day notice period constituted legal error, this issue is now moot and we need not address it.

22, 2009, one year after Unishippers and UPS entered into their contract and the date on which the Unishippers-UPS contract required exclusivity between the parties.

Finally, Unishippers filed a conditional cross-appeal, arguing that if we reverse we should hold that the district court erred in dismissing its claim for rescission of the Reseller Agreement. However, although we vacate the damages award for the time beyond the 180-day notice period, we conclude in Unishippers' favor that DHL breached its obligations under the Reseller and National Account Agreement by failing to provide 180 days' notice before ceasing domestic shipping services and uphold the award of damages for the 180-day period. Accordingly, we do not need to reach the issues in Unishippers' cross-appeal.

### III

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.[6] On remand, the district court must vacate the award for damages suffered by Unishippers beyond the 180-day notice period. Because both parties have prevailed in part, we vacate the district court's previous award of attorney fees and costs to Unishippers and remand for recalculation with respect to both parties for the proceedings below.[7] Because each party has prevailed in part on appeal, each shall

---

[6] Unishippers' Motion to Supplement Record Citations provides no new record information and is accordingly **DENIED**.

[7] The NAA provides for attorney fees and costs to the prevailing party. See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't. of Health & Human Res., 532

Continued . . .

bear its own fees and costs for the appeal.  <u>Lyon Dev. Co. v. Bus. Men's Assur. Co. of Am.</u>, 76 F.3d 1118, 1127 (10th Cir. 1996).

Entered for the Court


Carlos F. Lucero
Circuit Judge

---

U.S. 598, 603 (2001) ("A 'prevailing party' is one who has been awarded some relief by a court.").