GOLD STANDARD, INC., Plaintiff,
Appellant, and Cross–Appellee,

v.

GETTY OIL COMPANY and Getty Min-
ing Company, Defendants, Appel-
lees, and Cross–Appellants.

No. 940234.

Supreme Court of Utah.

Jan. 11, 1996.

Rehearing Denied May 7, 1996.

James S. Lowrie, Barry G. Lawrence, Deno G. Himonas, Salt Lake City, and Benard V. Preziosi, New York City, for plaintiff.

Carolyn B. McHugh, Jill A. Parrish, Brian J. Romriell, Mark F. James, and Steven G. Crockett, Salt Lake City, for defendants.

RUSSON, Justice:

Gold Standard, Inc. (GSI), appeals from (1) the trial court's entry of partial summary judgment in favor of Getty Oil Company and Getty Mining Company (collectively, Getty) on GSI's breach of contract and wrongful conversion claims, and (2) the trial court's entry of a judgment notwithstanding the verdict on GSI's fraud claim following a jury verdict in GSI's favor. Getty cross-appeals the trial court's entry of partial summary judgment in favor of GSI on Getty's breach of contract claim. We affirm.

### FACTS

■ On appeal from a trial court's entry of a judgment notwithstanding the verdict, we view the evidence and all reasonable inferences therefrom in a light most favorable to

the party who prevailed at trial. *Heslop v. Bank of Utah*, 839 P.2d 828, 839 (Utah 1992); *King v. Fereday*, 739 P.2d 618, 620 (Utah 1987); *Gustaveson v. Gregg*, 655 P.2d 693, 695 (Utah 1982). We recite the facts accordingly. *Heslop*, 839 P.2d at 830.

On December 11, 1973, GSI and Getty Mining Company entered into an agreement entitled "Operating Agreement" (the Agreement). The Agreement concerned a joint mining venture on property in the Mercur area near Tooele, Utah, to which GSI had acquired mineral leases.

Under the terms of the Agreement, Getty received a seventy-five percent interest in the project and GSI received a twenty-five percent interest. The Agreement further provided that the Mercur project was to be split into two phases: Phase I, which involved exploration and pre-development, and Phase II, which involved development and production. Phase I of the project was to be funded entirely by Getty, and Phase II was to be funded by the parties according to their proportionate interests. The Agreement specified that Phase II would begin after the parties formally approved an initial mine work plan following either an internal feasibility study funded entirely by Getty or an external feasibility study funded by the parties according to their proportionate interests. In addition, the Agreement provided that if either party failed to fund its relative share of Phase II, the other party would be entitled to convert the defaulting party to a net profits interest (NPI) holder with a reduced interest in the project.

Getty's top management decided to manage the Mercur project out of its Salt Lake City district office and assigned Robert Blanc as district manager, Robert Hautala as district production manager, and Joseph Berg as district in-house counsel in 1980. In late 1980, Getty gave GSI an engineering study prepared for Getty by Bechtel Corporation in an attempt to meet the feasibility study prerequisite of proceeding to Phase II. GSI protested that the Bechtel study was not a suitable feasibility study. In February 1981, GSI again requested a feasibility study. At some point prior to July 1981, Getty gave GSI a revised Bechtel engineering study, and

GSI again objected that it was not a proper feasibility study within the terms of the Agreement.

In July 1981, Getty's district officials made a presentation to Getty's top management recommending that Getty proceed with Phase II of the Mercur project. Getty's top management responded by approving a limited financial commitment and deferring its final decision until a first quarter 1982 checkpoint.

At a meeting between the parties on July 21, 1981, Getty's district officials advised GSI that Getty's top management wanted GSI to pay its twenty-five percent share of future costs. GSI once again protested, citing the need for an appropriate feasibility study. That evening, Getty's district production manager, Hautala, told Scott Smith, the president of GSI, that if he did not sign a letter agreeing to fund GSI's share that evening, Getty would kill the project. In addition to confirming Smith's agreement to fund GSI's share, the letter also contained an agreement by Getty not to convert GSI to NPI holder status until January 1, 1982. Smith signed the letter.

In September 1981, the parties formally approved an initial mine work plan, which was required by the Agreement to begin Phase II of the Mercur project. Meanwhile, GSI made ongoing efforts to obtain more information on the project from Getty to enable it to obtain funding for its twenty-five percent share.

In a letter dated December 17, 1981, the parties agreed to extend the deadline for GSI to secure funding from January 1, 1982, to February 1, 1982. When Smith was reluctant to sign this letter, Getty's district officials offered Smith a meeting with Getty's top management and Chase Manhattan Bank, a potential funding source to GSI. Smith signed the letter, but the meeting never transpired.

By early February 1982, GSI still had not obtained funding for its twenty-five percent share. Consequently, Getty exercised its contractual right under the Agreement to convert GSI to NPI holder status. However,

no written notice of conversion to NPI holder status was given to GSI at that time.

At a meeting between the parties on March 2, 1982, Getty's district officials formally advised GSI that Getty was converting GSI to NPI holder status. However, Getty's district manager, Blanc, informed Smith that "nothing was really changing" and that GSI could reenter as a twenty-five percent interest holder if it acquired financing.

Correspondence subsequent to this meeting indicated that the agreement to let GSI reenter had to be reduced to writing, which never occurred. Numerous letters to GSI from Getty stated that the promise made at the March 2 meeting was not a firm commitment, but only an agreement to consider allowing GSI to reacquire its twenty-five percent participating interest. Meanwhile, GSI continued to seek financing but was unable to do so. Texaco, Inc. (Texaco), purchased Getty in 1984 and later sold the Mercur project to American Barrick Resources Corporation (Barrick).

On December 8, 1986, GSI brought this suit against Getty, Texaco, and Barrick.[1] On July 3, 1989, GSI filed its third amended complaint, which asserted fourteen claims against defendants. Ten of these claims were dismissed by the trial court prior to trial, including GSI's breach of contract claims. The trial court also granted Getty's motion for partial summary judgment on GSI's wrongful conversion claim. GSI dismissed three of the four remaining claims prior to or during trial, leaving fraud as the only claim tried to conclusion.

Beginning on July 19, 1993, GSI's fraud claim was tried to a jury. At the close of GSI's case, Getty moved for a directed verdict, but the trial court reserved its decision on the motion. On September 3, 1993, the jury rendered its verdict in GSI's favor, awarding GSI $154,161,000 in actual damages and $250,000,000 in punitive damages. On September 13, the trial court reversed the jury verdict and granted Getty's motion for a judgment notwithstanding the verdict (j.n.o.v.).

On April 8, 1994, the trial court ruled on all post-trial motions and, on April 13, entered a judgment reflecting its rulings. Included in its April 13 judgment was a conditional grant of a new trial on the issue of punitive damages, which was made contingent on a successful outcome of GSI's appeal of the j.n.o.v. The trial court also dismissed Getty's counterclaim for breach of contract.

GSI appeals, asserting that the trial court erred in (1) granting Getty's motions for summary judgment and thereby dismissing GSI's wrongful conversion and breach of contract claims, (2) granting Getty's motion for a j.n.o.v., (3) striking the jury's award of punitive damages, and (4) making certain rulings related to its conditional grant of a new trial. Getty cross-appeals, challenging the trial court's dismissal of its breach of contract claim against GSI.

## SUMMARY JUDGMENT

GSI argues that the trial court erred in granting two summary judgment motions: (1) Getty's motion for a summary judgment declaring that GSI was properly converted from a participating party to NPI holder status, and (2) Getty's motion for summary judgment on GSI's claim for breach of contract regarding Getty's duty to provide GSI with a proper feasibility study within the terms of the Agreement.

Summary judgment is appropriate only where "there are no issues of genuine fact and the moving party is entitled to a judgment as a matter of law." *Billings v. Union Bankers Ins. Co.*, 819 P.2d 803, 805 n. 2 (Utah 1991). Thus, on appeal from the trial court's entry of summary judgment, "we determine only whether the trial court erred in applying the governing law and whether the trial court correctly held that there were no disputed issues of material fact." *Rocky Mountain Thrift Stores, Inc. v. Salt Lake City Corp.*, 887 P.2d 848, 851 (Utah 1994).

■ As to GSI's first claim, that the trial court erred in concluding that it was properly

---

1. GSI's claims against Texaco were dismissed before trial and are not before this court on appeal. In 1993, GSI settled with Barrick, leaving the two Getty defendants, Getty Oil Company and Getty Mining Company, as the only remaining defendants.

converted from a participating party to NPI holder status, GSI argues that as a matter of law Getty, as owner of the mine, served as GSI's fiduciary and therefore was under a special duty to protect GSI's interests. Because it failed to do so, argues GSI, its wrongful conversion of GSI to NPI holder status was actionable. Getty responds that the July 21, 1981, and December 17, 1981, letters signed and later ratified by the parties provide a proper ground for GSI's conversion to NPI holder status, and thus GSI's claim for wrongful conversion was properly dismissed by the trial court.

■ Upon review of the briefs and the record, it is readily apparent that GSI's argument that Getty should have acted as its fiduciary but failed to do so is without merit. Under Utah law, a fiduciary or confidential relationship will be found only "when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party." *Von Hake v. Thomas,* 705 P.2d 766, 769 (Utah 1985). Moreover, when the parties deal "at arm's length" or in an adversarial relationship, no fiduciary relationship can be said to exist. *Accord Sugarhouse Fin. Co. v. Anderson,* 610 P.2d 1369, 1373 (Utah 1980); *see Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp.,* 850 P.2d 447, 454 (Utah 1993). Given the adversarial nature of the relationship between GSI and Getty, as well as the fact that the parties consistently dealt with each other at arm's length, it cannot be said that Getty served as GSI's fiduciary here.

Furthermore, the July 21, 1981, and December 17, 1981, letters between the parties, as well as the terms of the Agreement itself, plainly support Getty's conversion of GSI to NPI holder status. Section II.E. of "Exhibit 'A'" of the Agreement expressly provides:

> [T]he interest of any party whose delinquency in the payment of funds continues for a period of three (3) months, may, at the option of the party advancing funds, be converted to a Net Profits Interest equal to sixty percent (60%) of its interest in Said Lands and the Project Property immediately prior to the close of such three (3) month period.

Moreover, the July 21, 1981, letter signed by representatives of both parties specifically refers to the above language and states, "Getty agrees not to exercise its rights under Section II.E. of said Exhibit A (i.e., convert [GSI's] interest to a net profits interest) before January 1, 1982." In addition, the parties' December 17, 1981, letter states:

> In response to our further discussions on November 20, Getty hereby agrees to amend our July 21, 1981 Letter Agreement by revising the reference to "January 1, 1982" in the third paragraph thereof to read "February 1, 1982." This amendment is being made to allow [GSI] additional time to cure its delinquent cash calls. As before, if any delinquent cash call payments by [GSI] continue after February 1, 1982, Getty may at any time after February 1, 1982, at its sole election, pursuant to Section II.E. of Exhibit "A" to the Operating Agreement, convert [GSI's] interest in the Mercur Project to a 15% Net Profits Interest.

These letters, taken together with the Agreement, clearly establish Getty's right to convert GSI to NPI holder status.

■ GSI nonetheless argues that its conversion to NPI holder status was improper because the above letters were signed under duress. However, as we have previously stated, " '[T]he mere fact that a contract is entered into under stress or pecuniary necessity is insufficient [to constitute duress].'" *Horgan v. Industrial Design Corp.,* 657 P.2d 751, 753 (Utah 1982) (alteration in original) (quoting *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.,* 96 Wash.2d 939, 640 P.2d 1051, 1054 (1982)). "To constitute legal duress [a] defendant must have acted against his will, and have had no other viable alternative." *Id.* at 754. Here, Smith, the signatory on behalf of GSI, cannot be said to have had no other viable option. Although the alternative of not proceeding with the project might not have seemed particularly palatable to Smith, that does not, by itself, eliminate its viability. Moreover, Smith's claims of duress are not consistent with his subsequent behavior. For instance, Smith made no attempt at any time to rescind the letters, nor did he ever

attempt to pursue GSI's remedies under the Agreement. To the contrary, GSI proceeded with its attempts to find funding and continued to cash the NPI interest checks from Getty as if the letters were binding. Under these circumstances, it seems disingenuous for GSI to argue that Smith signed the above letters under duress.

■ GSI's second summary judgment issue centers on whether the trial court erred in granting Getty's motion for summary judgment on GSI's claim for breach of contract arising from Getty's alleged breach of its duty to provide GSI with a proper feasibility study within the terms of the Agreement. GSI contends that an external feasibility study was mandated by the Agreement and thus the trial court erred in granting Getty's motion. Getty responds that the trial court properly determined that on the basis of the Agreement as well as the letters of July 21, 1981, and December 17, 1981, the parties agreed to proceed to Phase II of the Mercur project without an external feasibility study. Therefore, Getty contends that the grant of summary judgment on this issue should be upheld.

Our review of the record reveals that the terms of the Agreement do not mandate that an external feasibility study be performed prior to proceeding to Phase II but provide only that Getty "may" commission such a study. Specifically, section III.B.1.c of the Agreement, which addresses the need for such a feasibility study, provides in pertinent part:

Upon approval of a proposal for a feasibility study by Participating Parties owning a majority in interest in the area of Said Lands to be covered by the proposed study, such study *may* be commissioned to be made by a company which is not a party to this Agreement, to be determined by a majority in interest of all Participating Parties.

(Emphasis added.) Section III.B.2. confirms that such a feasibility study may not be required:

At such time as an internal feasibility report has been approved by all Participating Parties as sufficient to confirm the feasibility of placing in production a specifically delineated reasonably sized contiguous portion of Said Lands, *or* at such time as a feasibility study carried out pursuant to paragraph 1.c. of this Section IV.B. has confirmed such feasibility of so placing in production such a specifically delineated reasonably sized contiguous portion of Said Lands, such portion shall be established as a Mine.

(Emphasis added.) In other words, the Agreement expressly recognizes that the decision to proceed with the development of the mine could be based on an internal feasibility report with supporting facts and calculations or an external feasibility study as outlined in section III.B.1.c. Thus, the fact that the parties agreed to proceed to Phase II of the project without an external feasibility study is clearly contemplated within the terms of the Agreement.

■ Moreover, even if we were to determine that an external feasibility study was initially required under the Agreement for the project to proceed to Phase II, the letters subsequent to the Agreement plainly modified it to provide entry into Phase II without the feasibility study. The letter of July 21, 1981, clearly indicates that Phase II is beginning where it states, "Pursuant to our discussions on the above date, this will confirm our respective company's [sic] approval of the 'initial Mine Work Plan' as that term is defined in Section [IV.B.]3.a. of our December 11, 1973 Operating Agreement." Under the terms of the Agreement, approval of mine work plans is explicitly a Phase II activity. Likewise, the December 17, 1981, letter specifically refers to delinquent cash call payments made by GSI, which is another explicit reference to Phase II of the Mercur project given that GSI was not required to fund Phase I of the project.

Furthermore, GSI's argument ignores the fact that it took numerous actions indicating that Phase II had begun, such as approving the initial mine work plan and agreeing to proceed with developing the mine. The trial court also had before it numerous statements by GSI to its shareholders and documents that GSI sent to the Securities and Exchange Commission which indicated that the parties

had agreed with development of the mine. Thus, the trial court correctly concluded that the parties agreed to proceed to Phase II of the Mercur project without an external feasibility study. Accordingly, the trial court's dismissal of GSI's claim for breach of contract on the basis of Getty's failure to present it with such a feasibility study was proper.

## JUDGMENT NOTWITHSTANDING THE VERDICT

The basic dispute at trial involved GSI's allegation that at a meeting between the parties on March 2, 1982, Getty orally made a fraudulent promise to GSI that it would be allowed to regain its participating party status if it acquired financing. Getty countered that it promised only that district officials would *recommend* to Getty's top management that it accept any reasonable reentry proposal by GSI if the parties could reach an agreement on the terms and conditions of reentry. Substantial testimony was presented concerning letters exchanged by the parties subsequent to the March 2 meeting in which the parties expressed their conflicting views of what had been promised at that meeting. The jury found in GSI's favor, awarding GSI both compensatory and punitive damages. The trial court subsequently granted Getty's motion for a j.n.o.v., stating:

> In light of all of the written clarifications flowing from Getty to [GSI] which made clear that any right of re-entry was conditional and that Getty would only consider reasonable proposals and make recommendations to top management, the Court is of the opinion that plaintiff was not entitled as a matter of law to rely upon any inconsistent contemporaneous oral promises of re-entry made by Getty. Further, the Court is of the opinion that under the facts and circumstances of this case reasonable minds could not find that [GSI] so relied.

The trial court further ruled that GSI "failed as a matter of law to establish that its reliance on the misrepresentations caused it to lose any interest in the mine or profits therefrom" and, consequently, GSI did not establish "a sufficient nexus between the fraud relied upon and the loss claimed to allow the issue of damages to be submitted to the jury."

■ On appeal, GSI asserts that the trial court erred in granting Getty's motion for a j.n.o.v. Specifically, GSI argues that the trial court erred in concluding that GSI did not reasonably rely upon Getty's false representations and that GSI did not suffer damages as a result of its reliance on Getty's false representations. Getty responds that because GSI failed to prove the essential elements of fraud, the trial court correctly directed a verdict in Getty's favor.

■ As an initial matter, we address the proper standard of review. In ruling on a motion for a j.n.o.v., the trial court has no latitude but must be correct. *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 799 (Utah 1991). A j.n.o.v. can be granted only when the losing party is entitled to judgment as a matter of law. *Hansen v. Stewart*, 761 P.2d 14, 17 (Utah 1988). Thus, the trial court may properly grant a motion for a j.n.o.v. only when the evidence is, as a matter of law, insufficient to support the jury verdict. *See Cerritos Trucking Co. v. Utah Venture No. 1*, 645 P.2d 608, 611 (Utah 1982). Put differently, the trial court was justified in granting a j.n.o.v. only if, after looking at the evidence and all of its reasonable inferences in a light most favorable to GSI, the trial court concluded that there was no competent evidence to support a verdict in its favor. *King v. Fereday*, 739 P.2d 618, 620 (Utah 1987); *Gustaveson v. Gregg*, 655 P.2d 693, 695 (Utah 1982).

■ On appeal, we apply the same standard. *Heslop v. Bank of Utah*, 839 P.2d 828, 839 (Utah 1992); *King*, 739 P.2d at 620; *Gustaveson*, 655 P.2d at 695. In determining whether competent evidence supports the verdict, we accept as true all testimony and reasonable inferences flowing therefrom that tend to prove GSI's case, and we disregard all conflicts and evidence that tend to disprove its case. *Koer v. Mayfair Mkts.*, 19 Utah 2d 339, 342, 431 P.2d 566, 568–69 (1967).

■ Under Utah law, to bring a claim sounding in fraud, a party must allege (1) that a representation was made (2) concern-

ing a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage. *Crookston,* 817 P.2d at 800; *accord Mikkelson v. Quail Valley Realty,* 641 P.2d 124, 126 (Utah 1982); *Pace v. Parrish,* 122 Utah 141, 144–45, 247 P.2d 273, 274–75 (1952).

■ GSI first asserts that the trial court erred in concluding that GSI did not reasonably rely upon Getty's false representations. While the question of reasonable reliance is usually a matter within the province of the jury, *see Berkeley Bank for Coops. v. Meibos,* 607 P.2d 798, 801 (Utah 1980), there are instances where courts may conclude that as a matter of law, there was no reasonable reliance. *See Rubey v. Wood,* 13 Utah 2d 285, 287, 373 P.2d 386, 387–88 (1962); *Maack v. Resource Design & Constr., Inc.,* 875 P.2d 570, 577–78 (Utah Ct.App.1994); *Brown v. Weis,* 871 P.2d 552, 562–63 (Utah Ct.App. 1994).

Viewing the evidence in a light most favorable to GSI, *see Gustaveson,* 655 P.2d at 695, we must conclude that the jury believed Scott Smith's version of the oral promises made at the March 2, 1982, meeting. That is, our analysis begins with the assumption that Getty's district officials actually promised Smith at that meeting that GSI would be allowed to regain its participating party status if it acquired financing.

Even if Getty orally made the alleged fraudulent promise at the March 2 meeting, however, it is clear that GSI could not reasonably rely on that promise in light of the correspondence following that meeting. These letters explicitly indicated that the situation was not as GSI understood it to be. On March 3, 1982, GSI sent a letter to Getty outlining its perception that Getty "left [GSI] with the option of retaining its 25% participating interest for an indefinite period if it is

able to [fund its share]." In reply, Getty wrote a letter that same day which stated:

> 2. Pursuant to the Operating Agreement, the fifteen percent (15%) net profits interest of [GSI] shall not be eligible for an automatic reversion to a twenty-five percent (25%) participating interest. However, if [GSI] is able to obtain financing to fund a twenty-five percent (25%) participating interest, Getty *would consider* any reasonable proposal by [GSI] which would allow [GSI] to revert to a twenty-five percent (25%) participating party. *If Getty and [GSI] can mutually agree on the terms and conditions for [GSI] to "back in,"* then [GSI] shall revert to a twenty-five percent (25%) Participating Party.

(Emphasis added.) Additionally, in response to a proposed press release sent to Getty by Scott Smith, Getty sent GSI a letter on March 12, 1982, again reiterating that GSI could not rely on its interpretation of the promises made on March 2:

> Third, the third paragraph of your proposed news release also contains an inaccurate reference to [GSI] reverting to a 25% participating party. The agreement which I have made pertaining to [GSI] reverting to a 25% participating party is contained in Item 2. of the proposed letter agreement which I sent to you on March 3, 1982.

Getty then proceeded to repeat the above language from its March 3, 1982, letter. Also, at a March 24, 1982, meeting between the parties, Getty's district officials gave GSI a letter which contained the following language:

> 2. Pursuant to the Operating Agreement, the fifteen percent (15%) net profits interest of [GSI] shall not be eligible for an automatic reversion to a twenty-five percent (25%) participating interest. However, if [GSI] is able to obtain financing to fund a twenty-five percent (25%) participating interest, our office will recommend to Getty Oil Company's top management that [GSI] revert to a twenty-five percent (25%) Participating Party; provided, however, our office is not obligated to make any recommendation to Getty's top management with respect to any proposal by [GSI] to revert to a twenty-five percent

(25%) participating party unless such proposal is conditioned upon [GSI's] catching-up on any unpaid cash calls plus quarterly interest, dating back to July 6, 1981, at the rate of five (5) percentage points over the average prime rate for the quarter extended by the Bank of America, at San Francisco, California, until paid, but not in excess of the rate of interest permissible by Utah law. Any proposal by [GSI] pursuant to this paragraph No. 2 must be submitted to me on or before December 31, 1982.

Finally, on May 7, 1982, Getty sent GSI a letter stating:

I must remind you of Getty's long efforts to try to reach a final agreement with respect to our various differences of opinion pertaining to the interpretation of our Joint Venture Agreement and at the same time provide the maximum flexibility with respect to [GSI's] opportunity to participate. The various discussions which we have had at Getty's office, with and without other persons present, were directed towards reaching a total agreement. Our discussions did not lead to any incremental agreements as you have suggested in your May 6th letter. If we are not able to resolve all our differences, then Getty will not be bound by any portions of our discussions without specific written agreement confirming our understanding.

Thus, even if GSI initially reasonably relied upon the oral promises made at the March 2, 1982, meeting, in light of the numerous writings denying such a promise, GSI could not have reasonably continued to rely upon Getty's alleged promise. This conclusion is in keeping with well-settled Utah law. Under the law of this state, a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information. *Wood,* 13 Utah 2d at 287, 373 P.2d at 387–88.

"No matter how naive or inexperienced the defendants were, they could not close their eyes and accept unquestioningly any representations made to them. It was their duty to make such investigation and inquiry as reasonable care under the circumstances would dictate * * *."

*Id.* at 287, 373 P.2d at 387 (alteration in original) (quoting *Lewis v. White,* 2 Utah 2d 101, 269 P.2d 865 (1954)). Likewise, in *Mikkelson v. Quail Valley Realty,* 641 P.2d 124 (Utah 1982), this court again held that a party "cannot reasonably continue to rely on [the initially-received false information] once true and corrected information is furnished him." *Id.* at 126. The reasoning for such an approach was explained by the court as follows:

"The one who complains of being injured by such a false representation cannot heedlessly accept as true whatever is told him, but has the duty of exercising such degree of care to protect his own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances; and if he fails to do so, is precluded from holding someone else to account for the consequences of his own neglect."

*Id.* (quoting *Jardine v. Brunswick Corp.,* 18 Utah 2d 378, 382, 423 P.2d 659, 662 (1967)). Similarly, in the case at bar, it was unreasonable for GSI to heedlessly continue to accept that the oral promises made at the March 2, 1982, meeting were true and accurate when faced with numerous written communications to the contrary. Thus, we hold that the trial court correctly concluded that as a matter of law, GSI's reliance on those promises was not reasonable.

We note that this result comports with the treatment of the same or similar issues by other courts. *See, e.g., Kaye v. Pawnee Constr. Co.,* 680 F.2d 1360, 1367 (8th Cir. 1982); *Bedwell Lumber Co., Inc. v. T & T Corp.,* 386 So.2d 413, 415 (Ala.1980); *Russell Corp. v. BancBoston Fin. Co.,* 209 Ga.App. 660, 434 S.E.2d 716, 718 (1993). *See generally Phoenix Technologies, Inc. v. TRW, Inc.,* 846 F.Supp. 367, 372 (E.D.Pa.1994) (holding that summary judgment is appropriate where shortly after entering agreement, defendant knew that plaintiff's representations were false), *aff'd,* 43 F.3d 1462 (3d Cir.1994); *Hiliel v. Motor Haulage Co.,* 140 N.Y.S.2d 51, 54 (N.Y.Sup.Ct.1955) (holding that where a person has been given knowledge of the true facts, he cannot claim to have relied upon a misrepresentation of those facts),

*aff'd,* 1 A.D.2d 782, 149 N.Y.S.2d 224 (N.Y.App.Div.1956); *Keller v. Citizens Discount Corp.,* 104 Ohio App. 206, 144 N.E.2d 886, 887 (Ohio Ct.App.1957) (plaintiff in fraud action has no right to rely upon wrong information after defendant has informed him to the contrary). As stated by the Eight Circuit Court of Appeals, "[I]f a person has reason to doubt the truth of a representation or is informed of the truth before he acts, he has no right to act on it." *Kaye,* 680 F.2d at 1367 (citing *Bedwell,* 386 So.2d at 415). Likewise, in *Russell,* the court held, "Any oral representations . . . were superseded by the subsequent writing and provide no basis for reasonable detrimental reliance on an understanding contrary to that writing." *Russell,* 434 S.E.2d at 718.

We are of the opinion that the same rule should apply here. It is clear that after receiving the above correspondence, GSI could not reasonably continue to rely on Getty's oral promises. Accordingly, we hold that the trial court properly granted Getty's motion for a j.n.o.v. on GSI's fraud claim for lack of reasonable reliance.[2]

### OTHER RULINGS

GSI additionally contends that the trial court (1) incorrectly determined that the jury erred by ignoring jury instruction 39, which provided that GSI was entitled to only "net lost profits," (2) erred in striking the jury's award of punitive damages, and (3) erred in making certain rulings connected with its conditional grant of Getty's motion for a new trial on the issue of punitive damages. Getty also argues that the trial court improperly dismissed its breach of contract claim against GSI relating to certain issues connected with the trial court's conditional grant of Getty's motion for a new trial. However, because we affirm the trial court's grant of Getty's j.n.o.v., these issues need not be ·addressed. We have considered all other issues raised by

the parties and find them to be without merit. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989) (stating that appellate courts "need not analyze and address in writing each and every argument, issue, or claim raised").

### CONCLUSION

We affirm the trial court's grant of Getty's motions for partial summary judgment on GSI's breach of contract and wrongful conversion claims and the trial court's grant of Getty's motion for a j.n.o.v. on GSI's fraud claim.

ZIMMERMAN, C.J., HOWE, J., and RUSSELL W. BENCH and JUDITH M. BILLINGS, Court of Appeals Judges, concur.

Having disqualified themselves, STEWART and DURHAM, JJ., do not participate herein; RUSSELL W. BENCH and JUDITH M. BILLINGS, Court of Appeals Judges, sat.

---

**2.** Because we hold that the trial court correctly concluded that as a matter of law, GSI did not reasonably rely on Getty's promises, we need not address the trial court's alternative ground for granting Getty's motion for a j.n.o.v., that GSI's damages did not arise as a result of its reliance on Getty's false representations. However, even if we were to address this issue, it is clear that

the trial court properly concluded that GSI's damages were due to its conversion to NPI holder status by Getty, not to its reliance on Getty's allegedly fraudulent promises. Thus, GSI's reliance on Getty's misrepresentations did not, as a matter of law, cause it to lose any interest in the profits of the mine.