*This opinion is subject to revision before
publication in the Pacific Reporter*

**2016 UT 38**

IN THE

SUPREME COURT OF THE STATE OF UTAH

DON MCBROOM and HELEN IMMELT,
*Appellants,*

*v.*

WILLIAM H. CHILD, SHELDON CHILD, WILLIAM CRITCHLOW III,
PATRICIA CHILD, WILLIAM STEVEN CHILD, SHAUNA CHILD,
NANCY CHILD, DAVID CHILD, SUSAN CHILD, TAMARA CHILD,
KAREN CHILD, MICHAEL CHILD, KEYBANK NATIONAL ASSOCIATION,
and JOHN DOES 1-50,
*Appellees.*

No. 20140929
Filed August 26, 2016

On Direct Appeal

Third District, Salt Lake
The Honorable Paul G. Maughan
No. 110918878

Attorneys:

Mark F. James, Mitchell A. Stephens, Salt Lake City,
G. Stephen Long, Nicole A. Westbrook, Denver, CO,
for appellants

Alan L. Sullivan, Jared C. Fields, Christopher S. Hill,
Shawn T. Richards, R. Stephen Marshall, Steven J. McCardell,
Salt Lake City, for appellees

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE and JUDGE MORTENSEN joined.

Having been recused JUSTICE DURHAM does not participate;
COURT OF APPEALS JUDGE DAVID N. MORTENSEN sat.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1      Fifty-six years after the death of Rufus Call Willey, founder of the R.C. Willey & Son furniture empire, two of his grandchildren, Helen Immelt and Don McBroom, sued Helen Barber (their grandmother), William Child (their uncle; hereinafter Mr. Child), Sheldon Child (Mr. Child's brother), William Critchlow III (Mr. Child's attorney), and KeyBank[1] (as successor to Commercial Security Bank), alleging that they had deprived Ms. Immelt and Mr. McBroom of their rightful inheritance under the terms of their grandfather's will. We hold that all of Ms. Immelt's claims and most of Mr. McBroom's claims are barred by the terms of a Stock Settlement and Purchase Agreement (1973 Agreement) pursuant to which Ms. Immelt and Mr. McBroom (through Commercial Security Bank, as guardian of his estate) exchanged their contingent remainder interests under the will for five shares each in R.C. Willey & Son, Inc., which they then sold back to the business for $1,000 per share. As to Mr. McBroom's remaining two claims, we conclude that his breach of fiduciary duty claim against Mr. Child is circular and therefore fails, and that his breach of fiduciary duty claim against KeyBank is barred by the applicable statute of limitations. Accordingly, we affirm the district court's grant of summary judgment against Ms. Immelt and Mr. McBroom in all respects.

## BACKGROUND

### I. RUFUS CALL WILLEY'S ESTATE

¶ 2      In the early 1930s, Mr. Willey founded R.C. Willey & Son as a sole proprietorship, selling appliances door to door in Syracuse, Utah. The business was successful enough that in 1949 or 1950 Mr. Willey opened a 600-square-foot showroom adjacent to his home. In 1951, Mr. Willey's daughter Darline married Mr. Child, who began working

---

[1] The plaintiffs actually named KeyBank and Key Corporation, Inc., d/b/a KeyCorp, as defendants. Key Corporation, it appears, is unrelated to KeyCorp, the corporate parent of KeyBank. Regardless, the parties stipulated to the dismissal of Key Corporation and KeyCorp. In light of this history, and in order to avoid confusion, we refer only to KeyBank throughout this opinion.

in Mr. Willey's store soon thereafter. In June 1954, Mr. Willey fell ill. Mr. Willey asked Mr. Child to manage the store while he recuperated, but his condition worsened and Mr. Willey died on September 3, 1954, without returning to work.

¶ 3     The day before Mr. Willey died, he signed a Last Will and Testament that provided a life estate for his wife, Helen Swaner Willey, who later remarried and changed her name to Helen Barber (Ms. Barber). The remainder was to pass to his three children (Darrell Willey, Betty McBroom, and Darline Child) or, if they predeceased his wife, to their children. The will also allowed for Ms. Barber to operate the business "as a partner or otherwise."

¶ 4     In 1956, Mr. Willey's will was probated in Davis County. The Second District Court issued a "Decree Settling First and Final Account of Administratrix with Will Annexed and of Distribution." The decree granted Ms. Barber "any and all power and authority reasonably necessary to carry on said business of R.C. Willey & Son in a good and businesslike manner, and . . . [to] operate said business either as sole proprietor or partner or otherwise."

¶ 5     In 1959, Ms. Barber and Mr. Child incorporated R.C. Willey & Son, Inc., allowing them to operate the business as a corporation.[2] Under the Articles of Incorporation, Ms. Barber and Mr. Child had equal ownership of the corporation's shares (150 each), with nominal shares (one each) allocated to Sheldon Child, Clyde Barber (Ms. Barber's second husband), and Dean Swaner (Ms. Barber's brother). Mr. Child described Ms. Barber's interest in the corporation as a life estate subject to the remainder interests created by the will, while Mr. Child's half was based on Mr. Child's labor and contributions to the growth of the company. Ms. Barber passed away in 1989.

II. THE 1973 AGREEMENT

¶ 6     In 1973, Mr. Child, Ms. Barber, and all of Mr. Willey's children and grandchildren entered into an agreement that addressed the ownership of all shares of stock in R.C. Willey & Son (the 1973 Agreement). Some of the grandchildren, including Mr. McBroom, were minors at the time and were represented in the transaction by

---

[2] All further references to R.C. Willey & Son are to the corporate entity.

Commercial Security Bank, which the Second District Court appointed as their guardian. The 1973 Agreement was drafted by Mr. Critchlow, who represented several parties in the related transactions, including Mr. Child. Mr. Critchlow also represented the minor grandchildren, including Mr. McBroom, and their parents in petitioning for the appointment of Commercial Security Bank as guardian for Mr. McBroom and the other minors involved.

¶ 7    Before the 1973 Agreement, the shares of R.C. Willey & Son stock were held as follows:

| Name | Shares |
|------|--------|
| Helen Swaner Willey Barber | 508 |
| | (Life Estate in 498) |
| William H. Child | 510 |
| Sheldon Child | 1 |
| Clyde Barber | 1 |
| Dean Swaner | 1 |
| **Total Shares Outstanding** | **1021** |

¶ 8    After the 1973 Agreement, the shares were redistributed as follows:

| Shareholder | Shares |
|-------------|--------|
| Helen Swaner Willey Barber | 269 |
| Darrell S. Willey | 60 |
| Betty J. McBroom | 60 |
| William H. Child | 428 |
| Marty W. McBroom | 5 |
| Helen Darline M. Alexander (Ms. Immelt) | 5 |
| Randie Carol W. Boldra | 5 |
| Tricia Loraine Willey | 5 |
| William Steven Child | 41.5 |
| Minor children of Darline H. Child (deceased) | 124.5 |
| Minor daughter of Darrell S. Willey | 5 |
| Minor children of Betty J. McBroom (including Mr. McBroom) | 10 |
| Sheldon Child | 1 |
| Clyde Barber | 1 |
| Dean Swaner | 1 |
| **Total Shares** | **1021** |

The 1973 Agreement stated that this distribution was based on an actuarial valuation of each person's interest (vested or contingent).[3]

¶ 9    The 1973 Agreement rescinded all prior agreements related to the disposition of stock in R.C. Willey & Son and noted that, under the terms of the will, Darrell Willey, Betty McBroom, and Darline Child "and their respective children were bequeathed successive contingent remainder interests in and to the said business assets and goodwill of the business known as [R.C. Willey & Son]." Because Darline Child had passed away, her children's interests had vested under the terms of the will. At the time of the 1973 Agreement, the rest of the grandchildren, the children of Betty McBroom (including Ms. Immelt and Mr. McBroom) and the children of Darrell Willey, held only contingent remainder interests in Mr. Willey's estate, which included the "business assets and goodwill" of R.C. Willey & Son. Through the 1973 Agreement, Ms. Immelt and Mr. McBroom exchanged their contingent remainder interests for five shares each in R.C. Willey & Son. The 1973 Agreement also provided for the immediate purchase by the business of the shares allocated to Ms. Immelt and for the purchase of Mr. McBroom's shares once Mr. McBroom reached the age of majority, at a price of $1,000 per share.

### III. MS. IMMELT

¶ 10    Ms. Immelt was twenty-one years old when she signed the 1973 Agreement. She had a close relationship with her grandmother, Ms. Barber, who lived across the street from her. One day in 1973, when Ms. Immelt was outside of her home, Ms. Barber approached her,

---

[3] We note that Ms. Immelt and Mr. McBroom contest the validity of the actuarial valuation referenced in the 1973 Agreement. To support their contention that "the distribution under the 1973 Agreement was not based on actuarial science," they cite testimony from an "expert actuarialist." But that expert was never disclosed as an expert witness, and his affidavit was produced for the first time in Ms. Immelt and Mr. McBroom's reply in support of their motion to reconsider. Because the affidavit was not properly before the district court when it issued its first and second summary judgment rulings and because Ms. Immelt and Mr. McBroom filed it months after they had moved to certify the district court's rulings as final, we may not and do not consider it.

presented Ms. Immelt with the signature page of the 1973 Agreement, and asked her to sign it. "[Ms.] Barber explained to [Ms.] Immelt that she wanted to do something nice for all of her grandchildren" and was gifting them $5,000 each. Based on that conversation, Ms. Immelt believed that the $5,000 payment, which she does not dispute having received, was a gift and that the agreement her grandmother had her sign was to facilitate receipt of that gift. Ms. Immelt claims that she was shown only "a signature page" and that she did not know of the substance of the agreement, but the record shows that she signed at least four copies of the signature page.

## IV. MR. MCBROOM

¶ 11    Mr. McBroom was a minor at the time the 1973 Agreement was executed. As a minor, he had to be represented by a guardian in the transaction, so Ms. Barber had Mr. McBroom and his mother sign a Petition for Appointment of Guardian to be filed with the Second District Court.

¶ 12    In August 1973, Ms. Barber visited Mr. McBroom and his family in Upland, California, and informed him that she was going to give him a gift of $5,000 when he turned twenty-one years old. She told him that in order to receive the gift, he needed to sign several documents. Mr. McBroom was illiterate and could not read the documents, so his mother or his grandmother read them for him. He did not ask his mother what the documents meant. According to his testimony, he understood that he was signing for a $5,000 gift that he would receive when he turned twenty-one years old. The documents he signed included the guardianship petition and a waiver of notice of the guardianship proceedings.

¶ 13    The Second District Court appointed Commercial Security Bank as guardian of the estates of Mr. McBroom and the other minor grandchildren. On September 17, 1973, Commercial Security Bank filed a petition for approval of the 1973 Agreement on behalf of Mr. McBroom and the other minor grandchildren. The Second District Court approved the 1973 Agreement on October 12, 1973. Under the terms of the 1973 Agreement, Mr. McBroom would receive $5,000 in exchange for his five shares. On March 11, 1975, upon the petition of Commercial Security Bank, the district court authorized the sale of

6

Mr. McBroom's five shares of stock to R.C. Willey & Son for $1,000 per share.[4] On April 27, 1976, the Second District Court approved the guardian's report and accounting regarding the estates of Mr. McBroom and his brother Dirk McBroom, and it discharged Commercial Security Bank from its guardianship responsibilities as of May 1, 1977. Mr. McBroom turned twenty-one on August 8, 1977.

## V. THE MUTUAL RELEASE

¶ 14   In October 1995, Ms. Immelt and her then husband sued Mr. Child and fourteen other defendants in an unrelated case in the Bankruptcy Court of the United States District Court for the Central District of California. Ms. Immelt sued because of the garnishment of her paychecks pursuant to a ruling against her based on the mismanagement of her mother's estate. On November 27, 1995, Ms. Immelt and her then husband settled their case by entering into a Mutual Release with Mr. Child. The Mutual Release included the following provision:

> The Immelts, for and in consideration of mutual covenants and promises, hereby release, acquit and forever discharge William Child, his heirs, executors, administrators, successors and assigns from any and all

---

[4] Mr. McBroom alleges that he never received the $5,000 owed to him for his shares under the 1973 Agreement. He presented expert testimony that "it is highly probable" that his signature on a 1976 Receipt, Release and Settlement of Account for the receipt of $4,770 from Commercial Security Bank was "not authored by [Mr. McBroom]," i.e., forged. The defendants contest this allegation, noting that Mr. McBroom testified that his grandmother gave him money for his university tuition, "dorms," and school supplies and that the money she paid him "was part of [his] $5,000 gift." He eventually asked his grandmother whether there was "anything left over out of [his] gift," and after his grandmother told him that he needed to go to R.C. Willey & Son to receive the remaining amount of the gift, he went "over to the store and . . . got it." The defendants also argue that even if Mr. McBroom were not fully compensated for his shares, his cause of action would be against R. C. Willey & Son, which is not party to this lawsuit. We agree with the defendants on this point and therefore do not reach the issue regarding Mr. McBroom's receipt of the money.

claims, demands, controversies, actions, causes of action, damages and liabilities of any nature whatsoever, whether at law or equity, whether or not such claims are now or previously known, unknown, suspected, alleged or claimed.

## VI. PROCEDURAL HISTORY

¶ 15   In November 2011, Ms. Immelt and Mr. McBroom filed a complaint in the Third District Court in Salt Lake County against Mr. Child, Sheldon Child, Patricia Child, and Mr. Child's children (collectively, Child appellees); Mr. Critchlow; KeyBank; and fifty unnamed individuals. The complaint included claims of quiet title (against the Child appellees and the fifty unnamed individuals), civil conspiracy (against Mr. Child, Mr. Critchlow, and KeyBank), breach of fiduciary duty (against Mr. Child and Sheldon Child), conversion (against Mr. Child, Mr. Critchlow, and KeyBank), and intentional interference with inheritance (against Mr. Child, Mr. Critchlow, and KeyBank). Ms. Immelt brought separate claims for conspiracy to defraud (against Mr. Child and Mr. Critchlow) and negligent misrepresentation (against Mr. Child and Mr. Critchlow). And Mr. McBroom brought a separate claim for breach of fiduciary duty (against KeyBank). The Child appellees filed counterclaims against Ms. Immelt and Mr. McBroom for breach of the 1973 Agreement, breach of the Mutual Release, and defamation.

¶ 16   The district court first granted summary judgment for the Child appellees on all of Ms. Immelt's claims against them and on Mr. McBroom's claim for quiet title. The district court denied the Child appellees' motion for summary judgment on the remainder of the claims, and the parties moved forward with discovery. At the close of discovery, the Child appellees again moved for summary judgment. The district court granted summary judgment, disposing of the rest of Mr. McBroom's claims against the Child appellees and Mr. McBroom's claims against KeyBank, holding that "Mr. McBroom had sufficient information regarding the guardianship proceeding to create a duty of further inquiry" and, therefore, that "these claims are barred by the statute of limitations." In its third summary judgment order, the district court granted summary judgment for Mr. Critchlow on all of Ms. Immelt's and Mr. McBroom's claims against him.

¶ 17   Ms. Immelt and Mr. McBroom appealed the grants of summary judgment, pursuant to the district court certification of

finality under rule 54(b) of the Utah Rules of Civil Procedure. We have jurisdiction over this appeal under Utah Code section 78A-3-102(3)(j).

## STANDARDS OF REVIEW

¶ 18    "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 36, 250 P.3d 465. In our review, we view "the facts and all reasonable inferences . . . in the light most favorable to the nonmoving part[ies]," here, Ms. Immelt and Mr. McBroom. *Id.* "We may affirm a grant of summary judgment upon any grounds apparent in the record." *Id.*

## ANALYSIS

¶ 19    We affirm the district court's grants of summary judgment. With respect to the quiet title claim, the claim for breach of fiduciary duty against Sheldon Child, and Ms. Immelt's claim for breach of fiduciary duty against Mr. Child, we note that the parties have not briefed these claims on appeal. Therefore, we deem them abandoned and do not address them further in this opinion. In our analysis below, we first address Ms. Immelt's remaining claims and determine that they fail because she cannot, as a matter of law, have reasonably relied on her grandmother's statements to her about the purpose of the 1973 Agreement. We then consider Mr. McBroom's claims and determine that the Second District Court's orders approving the 1973 Agreement and the guardianship proceedings operate as a bar to the majority of Mr. McBroom's claims and that Mr. McBroom failed to seek to set aside the Second District Court's orders or the guardianship proceedings.[5] With respect to Mr. McBroom's breach of fiduciary duty claims, we agree with the district court that the claim against Mr. Child is circular and therefore fails as a matter of law and that the claim against KeyBank is barred by the statute of limitations because Mr. McBroom did not present a sufficient basis to toll its application.

---

[5] Because we are of the opinion that Mr. McBroom did not plead a claim for fraud on the court or otherwise seek to set aside the relevant Second District Court orders and proceedings, we need not and do not reach the question of whether the Third District Court would have had jurisdiction to hear those claims.

## I. MS. IMMELT'S CLAIMS TO SET ASIDE
THE 1973 AGREEMENT

¶ 20    We hold that the 1973 Agreement is a complete bar to all of Ms. Immelt's claims. The core of Ms. Immelt's argument is that the district court erred in granting summary judgment against her because she presented evidence that she "was induced into signing the 1973 Agreement on the basis of material misrepresentations." And she seeks to distinguish case law charging her with knowledge of the 1973 Agreement on the basis that she did not see the rest of the document and thought the agreement's purpose was to facilitate a gift from her grandmother. These arguments fail because they do not demonstrate the existence of a genuine issue of material fact with respect to a key element of fraud-based claims: reasonable reliance. *See Price-Orem Inv. Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986) ("Utah long ago acknowledged the tort of negligent misrepresentation, which provides that a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury when the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact."); *Robinson v. Tripco Inv., Inc.*, 2000 UT App 200, ¶ 19, 21 P.3d 219 ("One of the elements of fraud that a plaintiff must prove is that he or she, 'acting reasonably and in ignorance of the statement's falsity, did in fact rely upon the misrepresentation.'" (citation omitted)).[6]

¶ 21    The catch with Ms. Immelt's claims is that she unquestionably signed the 1973 Agreement and is charged with knowledge of its content. In Utah, "a party cannot reasonably rely upon oral statements by the opposing party in light of contrary written information." *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1068 (Utah 1996). So even assuming that Ms. Immelt's grandmother said that she was going to give Ms. Immelt a $5,000 gift, Ms. Immelt could not reasonably rely on the false information. Even if the only document she was provided with was the signature page of the 1973 Agreement, that

---

[6] Because we decide that the 1973 Agreement serves as a complete bar to all of Ms. Immelt's claims, we need not and do not reach her arguments regarding the Mutual Release.

page included the statement that "this Agreement may be enforced in equity by specific performance or injunction, or both, and that such remedies shall be cumulative." This language is a clear indicator that she was signing a legally binding document. Additionally, the first line of the signature page starts in the middle of a sentence, which should have alerted Ms. Immelt to the fact that the signature page was not a self-contained document but that the full document included at least one more page in addition to the one she was shown. Ms. Immelt should have asked for the rest of the pages of the 1973 Agreement so she could read and understand what she was signing. However, there is no evidence that she ever sought to obtain the document she signed. Because Ms. Immelt had already reached the age of majority, she had a "duty [to] exercis[e] such degree of care to protect [her] own interests as would be exercised by an ordinary, reasonable and prudent person under the circumstances." *Id.* (citation omitted). This duty certainly included inquiring after the rest of the pages of the 1973 Agreement and reading them in order to fully understand the agreement that she was making.

¶ 22 "No matter how naive or inexperienced [Ms. Immelt] [was], [she] could not close [her] eyes and accept unquestioningly any representations made to [her]. It was [her] duty to make such investigation and inquiry as reasonable care under the circumstances would dictate." *Id.* (citation omitted). Because she failed to do so, she "is precluded from holding someone else to account for the consequences of [her] own neglect." *Id.* (citation omitted). "One party to a contract does not have a duty to ensure that the other has a complete and accurate understanding of all terms embodied in a written contract." *Res. Mgmt. Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1047 (Utah 1985). Instead, "[e]ach party has the burden to understand the terms of a contract before he affixes his signature to it and may not thereafter assert his ignorance as a defense." *Id.* "To permit a party . . . to admit that he signed [a written contract] but to deny that it expresses the agreement he made or to allow him to admit that he signed it but did not read it or know its stipulations would absolutely destroy the value of all contracts." *Garff Realty Co. v. Better Bldgs., Inc.*, 234 P.2d 842, 844 (Utah 1951). Ms. Immelt cannot use her subjective belief that she was merely receiving a gift from her grandmother, nor can she use the fact that she did not read the rest of the 1973 Agreement, to escape the knowledge that was imputed to her once she affixed her signature to that agreement.

¶ 23    We recognize that

> a person who, having the capacity and an opportunity to
> read a contract, is not misled as to its contents *and* who
> sustains no confidential relationship to the other party
> cannot avoid the contract on the ground of mistake if he
> signs it without reading it, at least in the absence of
> special circumstances excusing his failure to read it.

*Id.* (emphasis added); *see also Tocco v. Richman Greer Prof'l Ass'n*, 912
F. Supp. 2d 494, 521 (E.D. Mich. 2012) ("The Michigan courts have long
recognized that a plaintiff cannot establish a reasonable reliance by
relying 'on oral representations that are contradicted by a written
contract between the parties or otherwise conflict with a written
document that is readily available to the plaintiff.'" (citation omitted)).
Ms. Immelt had the capacity to read the 1973 Agreement. Unlike
Mr. McBroom, there is no evidence suggesting that she was illiterate or
otherwise incapable of reading the 1973 Agreement. Ms. Immelt also
had the opportunity to read it. As stated above, she had a duty to ask
for and read the rest of the pages of the 1973 Agreement. Because there
is no indication that she made such an effort, we cannot assume that
her grandmother would not have complied with the request. In
addition, Ms. Immelt did not have a confidential relationship with any
of the parties to the 1973 Agreement.[7] Nor do we determine that there
were special circumstances rising to a level sufficient to "excus[e] [her]
failure to read [the contract]." *Garff Realty*, 234 P.2d at 844. As a result,
Ms. Immelt cannot avoid the effects of the 1973 Agreement on the
grounds of fraud or negligent misrepresentation.

¶ 24    In short, Ms. Immelt signed the 1973 Agreement. Therefore,
she is charged with knowledge of its contents under the law, even
though her grandmother made separate oral representations regarding
its contents. Ms. Immelt could not rely upon her grandmother's
representations when she was given the 1973 Agreement signature
page, which clearly indicated that she was signing a legally binding

---

[7] Ms. Immelt labels her relationship with Ms. Barber as "close" and
asserts that at the time she signed the 1973 Agreement they visited
"several times a day." She does not, however, maintain that their
relationship rose to the level of a legally cognizable confidential
relationship.

document; as an adult, she was under a duty of ordinary and reasonable care, and she was expected to ask for and read the rest of the document to know, understand, and protect her own interests. Thus, Ms. Immelt is "bound both at law and in equity, even though [she] suppose[d] the writing [was] an instrument of an entirely different character." *Id.* Consequently, the 1973 Agreement stands as a complete defense to all of her claims; Ms. Immelt signed away all her rights to R.C. Willey & Son when she exchanged her contingent remainder interest in the business for five shares of stock, which she then sold for $5,000.

## II. MR. MCBROOM'S CLAIMS TO SET ASIDE THE 1973 AGREEMENT

¶ 25   Most of Mr. McBroom's claims are likewise barred by the 1973 Agreement. However, his claims are slightly more complicated because Mr. McBroom was a minor when the 1973 Agreement was signed. His interests were represented by a guardian at the time—Commercial Security Bank, the predecessor to KeyBank. He argues that his claims, which require the court to set aside the 1973 Agreement and guardianship proceedings in order to grant him relief, stand as "independent equitable action[s]." *St. Pierre v. Edmonds*, 645 P.2d 615, 618 (Utah 1982). Specifically, Mr. McBroom claims that his lawsuit was an "independent action for fraud on the court." In the alternative, Mr. McBroom argues that no court approved the 1973 Agreement and thus no court order needs to be set aside for him to recover. For reasons set forth below, we hold that the 1973 Agreement bars Mr. McBroom's claims, with the exception of his breach of fiduciary duty claims against Mr. Child and KeyBank.

¶ 26   The Second District Court approved the 1973 Agreement. Mr. McBroom cannot challenge the 1973 Agreement or the guardianship proceedings unless he pleads an independent action for fraud on the court seeking to set aside the court orders or files a rule 60(b) motion. UTAH R. CIV. P. 60(b); *Gillmor v. Wright*, 850 P.2d 431, 435–36 (Utah 1993). Mr. McBroom did not file a rule 60(b) motion, but claims that he filed an "independent equitable action." However, Mr. McBroom argued his "independent action" to set aside the orders of the Second District Court for the first time in his response to KeyBank's motion for summary judgment. His summary judgment memorandum does not meet the pleading requirements of Utah law. *See* UTAH R. CIV. P. 8(a). Furthermore, his complaint cannot constitute an "independent action" in this context because, even though

Mr. McBroom claimed the orders were procured by fraud, he did not file any claim asking that the Second District Court's orders approving the 1973 Agreement or guardianship proceedings be set aside due to fraud on the court. Thus, he did not file an independent, equitable action to set aside the court orders, and he cannot collaterally challenge the 1973 Agreement or guardianship proceedings, which were approved by the Second District Court.

¶ 27   In the alternative, Mr. McBroom argues that "[n]o court ever approved of the 1973 Agreement" and that, as a result, "no court has to set it aside in order for [Mr.] McBroom to make a claim for damages." We find these assertions vexing. The Second District Court clearly approved the 1973 Agreement as it relates to Mr. McBroom. The order is actually titled "Order Approving Stock Settlement and Purchase Agreement" (i.e., the 1973 Agreement). Because of the Second District Court's approval, Mr. McBroom was obligated to file an independent action for fraud on the court or a rule 60(b) motion seeking to set the 1973 Agreement aside. He failed to do so. As a result, the majority of his claims are barred by the 1973 Agreement.

## III. MR. MCBROOM'S BREACH OF FIDUCIARY DUTY CLAIMS

¶ 28   The only claims not barred by the 1973 Agreement are Mr. McBroom's breach of fiduciary duty claims. Those claims fail for other reasons: Mr. McBroom's argument regarding the breach of fiduciary duty by Mr. Child is circular and must fail, and Mr. McBroom's claim against KeyBank is barred by the statute of limitations because Mr. McBroom has not met the requirements for application of the equitable discovery rule.

### A. Mr. McBroom's Breach of Fiduciary Duty Claim Against Mr. Child

¶ 29   Mr. McBroom first argues that Mr. Child violated the fiduciary duty that he owed to Mr. McBroom as a shareholder in R.C. Willey & Son. Mr. McBroom claims that he was a minority shareholder in R.C. Willey & Son since 1959. He further argues that "[Mr.] Child had an obligation to ensure [Mr.] McBroom was treated fairly under the 1973 Agreement" but failed to do so as evidenced by the "unequal treatment" of Mr. McBroom in the terms of the 1973 Agreement.

¶ 30   Mr. Child counters that, "at most, Mr. McBroom was a contingent remainderman" and that "Mr. McBroom was not a

shareholder in [R.C. Willey & Son] until the execution of the 1973 Agreement." Furthermore, he argues that the terms of the 1973 Agreement, which was "a transaction for cash payment for outstanding shares of stock . . . supported by the opinions of court-appointed appraisers," did not constitute a breach of fiduciary duty.

¶ 31   Mr. McBroom's argument against Mr. Child presupposes that Mr. McBroom was owed a fiduciary duty prior to the 1973 Agreement. But Mr. McBroom held only a contingent remainder interest in his grandfather's business under the terms of the will. His interest would vest only if his mother predeceased his grandmother. A contingent remainder beneficiary interest is not the same as an ownership interest in the company. Mr. McBroom was not a shareholder of R.C. Willey & Son under the terms of the will; he did not become a shareholder until his guardian agreed to exchange Mr. McBroom's contingent remainder interest in the company for a present possessory interest in the form of five shares of stock in R.C. Willey & Son, which he then sold back to the company for $5,000. Thus, it was not until the 1973 Agreement that Mr. McBroom held a vested interest in R.C. Willey & Son and was owed a fiduciary duty; without the 1973 Agreement, Mr. McBroom was not owed a fiduciary duty as a shareholder of R.C. Willey & Son by Mr. Child. The very act that created the fiduciary duty cannot be held to have violated the fiduciary duty.[8] Therefore, the argument that Mr. Child violated his fiduciary duty to Mr. McBroom by causing him to enter into the 1973 Agreement is circular and must fail.

---

[8] We pause to note that Mr. McBroom offers no authority for the proposition that a corporate officer or director owes a fiduciary duty to a holder of a contingent beneficial interest in stock in a company. Nor are we aware of any such authority, even in the context of a closely held corporation.

*B. Mr. McBroom's Breach of Fiduciary Duty Claim*
*Against KeyBank*

¶ 32    The final claim is Mr. McBroom's breach of fiduciary duty claim against KeyBank, which the district court found was barred by the applicable statute of limitations. Mr. McBroom argues that "[t]he trial court invaded the province of the jury" by making factual findings against Mr. McBroom and by holding that the equitable discovery rule did not toll the statute of limitations and thus preserve his claim against KeyBank. Specifically, Mr. McBroom argues that he merits the application of equitable tolling based on the concealment of his claim or on exceptional circumstances. As a result, Mr. McBroom claims, summary judgment was incorrectly granted for KeyBank.

¶ 33    KeyBank, in turn, argues that Mr. McBroom's claims are barred by the statutes of limitations. It further argues that the statutes of limitations are not tolled by the equitable discovery rule because Mr. McBroom failed to "show[] that he did not know and could not reasonably have known of the facts underlying the cause of action in time to comply with the limitations period." Additionally, KeyBank did not conceal from Mr. McBroom his cause of action.

¶ 34    We conclude that Mr. McBroom's fiduciary duty claim against KeyBank does not merit application of the equitable discovery rule. The rule applies in either of two situations:

> (1) a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct or (2) the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.

*Berneau v. Martino*, 2009 UT 87, ¶ 23, 223 P.3d 1128 (internal quotation marks omitted). "Yet before a statute of limitations may be tolled under either situation, the plaintiff must make an initial showing that he did not know nor should have reasonably known the facts underlying the cause of action in time to reasonably comply with the limitations period." *Id.* Here, Mr. McBroom has not "show[n] that he did not know nor should have reasonably known the facts underlying [his] cause of action in time to reasonably comply with the limitations period." *Id.*

¶ 35    Since Mr. McBroom was a minor at the time of the 1973 Agreement and when his guardian sold his shares in 1975, the statute

of limitations did not begin to run on his claim until he reached the age of majority on August 8, 1977.[9] UTAH CODE § 78B-2-108. Under the applicable statute of limitations, he was required to bring his claim against KeyBank's predecessor, Commercial Security Bank, within three years of that date. *Id.* § 78B-2-221. Mr. McBroom had enough information about the transactions to give rise to a duty "to exercise reasonable diligence in discovering the facts that gave rise to [his] cause of action" upon reaching the age of majority. *Colosimo v. Roman Catholic Bishop of Salt Lake City*, 2004 UT App 436, ¶ 23, 104 P.3d 646.

---

[9] Mr. McBroom argues that the Second District Court lacked jurisdiction to approve of the sale of his shares because "he had obtained the age of majority" and therefore "the guardian ha[d] no further rights in the estate." He cites *Stanton v. Stanton* for the proposition that "both before and after the 1975 amendment to [the Utah majority statute], the statutory age of majority for both males and females in Utah was 18, not 21." 429 U.S. 501, 505 (1977) (Stevens, J., dissenting). Mr. McBroom fails to acknowledge that this quote is actually from Justice Stevens's dissenting opinion in *Stanton* and is not a statement of the law regarding the age of majority in Utah. *See id.* Instead, at the time of the Second District Court's approval of the sale of Mr. McBroom's shares, the age of majority for a male in Utah was twenty-one years. *See Stanton v. Stanton*, 421 U.S. 7, 9 (1975) (referencing the appellant's argument "that Utah Code Ann. § 15-2-1 (1953) to the effect that the period of minority for males extends to age 21 and for females to age 18, is invidiously discriminatory" (footnote omitted)). On March 24, 1975, the Utah Legislature amended the statute and established a uniform age of majority of eighteen years. Law of March 24, 1975, ch. 39, 1975 Utah Laws 121. The legislation went into effect on May 13, 1975. *See Wiker v. Wiker*, 600 P.2d 514, 515 (Utah 1978). Mr. McBroom turned eighteen on August 8, 1974, and KeyBank petitioned to sell his shares in February 1975. On those dates, the amendment to the age of majority was not yet in effect. Thus, Mr. McBroom was still a minor at the relevant time, and the Second District Court had jurisdiction over the guardianship proceedings. *Cf. Memmott v. Bosh*, 520 P.2d 1342, 1343 (Utah 1974) ("[W]hen a minor attains majority status the guardian has no further rights in the estate and only has a duty to account to or to make a settlement with his former wards.").

¶ 36 In other words, Mr. McBroom was on inquiry notice regarding his claim against KeyBank. The "inquiry notice maxim [is] that 'the means of knowledge is equivalent to knowledge.'" *Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, ¶ 37, 108 P.3d 741 (citation omitted). "Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 838 (Utah 1998) (citation omitted). Under the present circumstances, we hold that Mr. McBroom was on inquiry notice regarding his cause of action against KeyBank.

¶ 37 Mr. McBroom signed the guardianship petition and the waiver of notice of the guardianship proceedings, and he had his mother or his grandmother read the documents for him (although he no longer remembers what they said). In the thirty-seven years between the conclusion of the guardianship proceedings and his review of the court documents in 2010, and after receiving part or all of the $5,000 he was owed, Mr. McBroom did not make any effort to look into what he signed in the early 1970s or how it related to his interest in Mr. Willey's estate. In light of Mr. McBroom's knowledge of the 1973 Agreement and the guardianship, Mr. McBroom had a duty to exercise reasonable diligence to discover the rest of the facts surrounding his cause of action as it related to his guardian's actions on his behalf. His knowledge of the circumstances surrounding his cause of action put him on inquiry notice of his cause of action against KeyBank. As a result, because Mr. McBroom has not made the initial showing required by the discovery rule that "he did not know nor should have reasonably known the facts underlying [his] cause of action in time to reasonably comply with the limitations period," he does not merit its application to toll the statute of limitations for his claim against KeyBank. *Berneau*, 2009 UT 87, ¶ 23. Thus, the statute of limitations bars his claim against KeyBank.

## CONCLUSION

The 1973 Agreement bars all of Ms. Immelt's claims and most of Mr. McBroom's claims, with the exception of Mr. McBroom's breach of fiduciary duty claims against Mr. Child and KeyBank. Mr. McBroom's fiduciary duty claim against Mr. Child fails because it is circular. And the statute of limitations bars Mr. McBroom's fiduciary duty claim against KeyBank because he was on inquiry notice of the facts of his claim and did not show that he met the threshold requirement for

application of the equitable discovery rule to toll the statute of limitations. As a result, we affirm the award of summary judgment and remand the matter to the district court for further proceedings.

––––––––––––––